Walter L. PAULUS, d/b/a Robert Paulus Construction Company, Plaintiff-Respondent,

v.

The CITY OF ST. LOUIS, a Municipal Corporation, Defendant-Appellant.

Nos. 33126, 33136.

St. Louis Court of Appeals.

Missouri.

Sept. 16, 1969.

Ferrara & Mulligan, St. Louis, for plaintiff-appellant.

Gary M. Gaertner, City Counselor, John J. Fitzgibbon, Associate City Counselor, Donald R. Carmody, Asst. City Counselor, St. Louis, for defendant-respondent.

JAMES H. KEET, Jr., Special Judge.

Plaintiff-respondent, a general contractor, challenges the right of appellant, the City of St. Louis, to retain $4,234 which plaintiff paid to the City under protest for a building permit after plaintiff had begun construction of the Clinic and Administration Building at the St. Louis State Hospital under a $4,291,600 contract with the State of Missouri. In a jury-waived trial on plaintiff's petition, which alleged that the City erroneously and without legal authority required plaintiff to pay the permit fee, the trial court awarded plaintiff judgment for $4,234. The City appeals from this judgment. The trial court disallowed interest. Plaintiff filed a notice of appeal from such disallowance, but has not perfected said appeal nor briefed the question. The plaintiff's appeal in 33,136 is dismissed.

Plaintiff moves to dismiss the appeal because City did not file timely notice of appeal. The motion must be overruled. On November 2, 1967, the 90th day after City timely filed its first motion for new trial, the court entered its order (1) finding, as contended by City in its said motion, that it had erred in awarding interest because interest is not " * * * allowed for recovery back for a tax or a fee and there is no statutory authority for such a judgment for interest"; (2) ordering a new trial on the "issues of interest"; and (3) ordering that in all other respects the judgment of July 25 " * * * remain in full force and effect, but be held in abeyance pending entry of final judgment in this cause, including the issues of interest * * *."

The initial judgment could not be final until disposition of City's initial motion for

a new trial. Civil Rule 78.02.[1] The court had the power and discretion to grant a new trial on all or part of the issues after trial by the court. Civil Rule 78.01. On November 15, the following occurred successively: counsel for each party appeared and the cause was submitted for a new trial on the evidence previously adduced; judgment was entered in favor of plaintiff for $4,234 (without interest) and costs; a second motion for new trial by City was filed, presented, argued, submitted, and overruled; and City filed notice of appeal.

▬▬ Plaintiff contends that the court did not have the power or authority to hold the judgment for principal in abeyance. The trial court had such power. There was no final judgment, since the issue of interest was not decided and disposed of until after new trial on that issue on November 15. The court did not under Civil Rule 82.06 designate the judgment of November 2 (as to principal) as final. Rather, the exact opposite. This the court had the power and authority to do, by withholding entry of final judgment until it held a new trial on and ruled on the issue of interest, which was related to the issue of the principal. In order to be final and appealable a judgment in a non-jury case must dispose of all related issues, unless the judgment, disposing of just part of the issues, is designated as a final judgment by the trial court. Kansas City Power & Light Co. v. Kansas City, Mo., 426 S.W.2d 105, 108; Schumacher v. Sheahan Investment Co., Mo. App., 424 S.W.2d 84, 86; Ramatowski v. Ramatowski, Mo.App., 414 S.W.2d 827, 828–829; L & L Leasing Co. v. Asher, Mo.App., 440 S.W.2d 181, 182. See, in relation to the power of a trial court over its judgments, State ex rel. Schweitzer v. Greene, Mo. En Banc, 438 S.W.2d 229, 232. Civil Rule 75.01 and former Supreme Court Rule 3.25 incorporated as part of Civil Rule 75.01 (both dealing with the trial court's control over judgments for 30 days after entry of judgment) and Schenberg v. Schenberg, Mo.App., 307 S.W.2d 697, all cited by plaintiff, do not aid plaintiff on its motion.

The court reviews the record de novo both on the law and the evidence as in an equity case, giving due deference to the opportunity of the trial court to observe the witnesses and determine their credibility under Civil Rule 73.01(d), V.A.M.R. Upon such review the judgment nisi will not be set aside unless clearly erroneous, Huff v. Trowbridge, Mo., 439 S.W.2d 493, 497. Since the oral evidence is largely undisputed and much of the total evidence consists of writings and documents, the same deference is not due the trial court as would otherwise be given in cases involving disputed oral testimony. Prior v. Hager, Mo. App., 440 S.W.2d 167, 172. The court finds the facts to be as set out herein.

The construction contract was awarded to plaintiff as general contractor on September 4, 1959 for erection of the building for a total cost of $4,291,600 under an appropriation of $5,200,000 for "constructing, furnishing and equipping of Clinic and Administration Building, including approved safety features for eliminating fire and other hazards" (Laws 1959, H.B. 270, p. 9, Sec. 13). Plaintiff's estimater, Mr. Armistead (the only witness at trial), had not included any amount (for purpose of arriving at plaintiff's bid price on the job) for a building permit. His estimate for "Overhead Items" showed "Permit Not req[uired]." It listed 104 weeks at $170 for "supervision." Plaintiff did not inquire of City, prior to submitting its bid, as to whether City would require a permit under the construction contract.

The drawings, schedules, and specifications (including scope of work involved, notice to contractors, instructions to bidders, bond forms, special and general conditions, bidder qualification requirements, prevailing wage determination, form of contract and addenda) were prepared by the Division of Planning and Construction and

---

1. References to Civil Rules are to V.A.M.R. Statutory references are to V.A.M.S. except where otherwise stated.

dated April 30, 1959. A firm of architects and engineers and a consulting structural engineer and consulting mechanical engineer, all of St. Louis, were engaged by the State. The contract was signed by the Governor, the Chief of Planning and Construction (herein called the Chief) and the Director of the Department of Public Health and Welfare (herein called the Department).

The specifications bore the names of the Director of the Department and the Director of its Division of Mental Diseases. Very extensive and detailed, they included: provisions for priority of construction; a requirement that bidders direct requests for interpretation of the meaning of the drawings and specifications to the Chief; prevailing wage rates certified pursuant to statute by the Industrial Commission of Missouri; construction conditions which required temporary barricades, walkways, and signal lights to comply with local ordinances; a provision requiring the elevator contractor to obtain and pay for necessary municipal or state inspection or permit and make such tests as are called for by the regulations of such authorities and in the presence of their authorized representatives in regard to electrical dumb-waiters; a requirement that electrical work be done in accordance with the latest National Electrical Code, American Standard Safety Code for electrical dumb-waiters and escalators, and any local codes and requiring the elevator contractor to obtain and pay for necessary municipal or state inspection or permit and make such tests as their regulations called for and in the presence of their authorized representatives; and provisions requiring that the seating plan for audience seats comply in all respects with applicable building ordinances. Installation of x-ray protection was to be made after work performed by others which had been inspected and approved by the architects.

Article 8 of the General Conditions provided, in pertinent part:

"SURVEYS, PERMITS AND REGULATIONS: a. The Owner shall furnish all surveys unless otherwise specified. The Contractor shall obtain and pay for all permits, licenses, certificates, inspections and other legal fees required by all applicable Municipal Ordinances and the State and Federal Laws. Easements for permanent installations shall be secured and paid for by the Owner, unless otherwise specified. b. The Contractor shall give all notices and comply with all laws, ordinances, rules and regulations bearing on the conduct of the work as drawn and specified. If the Contractor observes that the drawings and specifications are at variance therewith, he shall promptly notify the Owner in writing, and any necessary changes shall be adjusted as provided in the Contract for changes in the work. If the Contractor performs any work knowing it to be contrary to such laws, ordinances, rules and regulations, and without such notice to the Owner, he shall bear all costs arising therefrom."

Article 9(b) required plaintiff to take all necessary precautions for the safety of employees in the work and to comply with all "applicable" ordinance provisions to prevent accidents and injury to persons on or about or adjacent to the premises. Article 10 obligated plaintiff to provide proper facilities for inspection and supervision and provided that the State would have a construction supervisor on the job to assure the State that the contract was being properly fulfilled. It likewise gave the State the right to inspect, examine and test materials and workmanship and at any and all times during manufacturing or construction.

Article 13 required plaintiff to give efficient supervision to the work and gave the State the right to terminate plaintiff's employment if it persistently disregarded ordinances. At the end of the work, the State was to make final inspection. The specifications required the electrical and plumbing subcontractors and the heating, ventilating and air conditioning subcontractor to obtain all necessary permits and upon completion to submit a certificate of final inspection and approval by governing authorities. The

electrical contractor was to pay all taxes and inspection fees. The subcontractors were to pay all city costs in their work.[2]

City's Building Code, Part I, Sec. 33, provided:

"PERMITS TO BE ISSUED TO WHOM.—No permit shall be issued except to the legal owner of the property to which such permit applies, to a lessee thereof of record, or to an authorized agent of such owner or lessee. Permits for the installation or operation of plumbing systems, heating apparatus, boilers, elevators, dumb-waiters, escalators, mechanical refrigeration and air conditioning systems shall be issued only to agents qualified for such work. * * * *"

Plaintiff began excavation in November, 1959, without applying to City for a permit, then believing that City had no right to require a construction permit since the land was owned by the State.[3] About three or four weeks later, someone with City's Building Commissioner's Office asked Armistead to bring the plans and obtain a permit so that it could include the large project in its periodic statistics on building activities. Armistead complied. The clerk behind the desk told him no fee would be required since it was a "state job." No permit was then issued. Later, someone on the Commissioner's staff demanded payment of a permit fee and told Armistead that they could close down the job if "we didn't take out the permit and pay for it." Armistead, for plaintiff, paid the demanded amount at the Commissioner's office in December, 1959 and got the permit for a "Class I Fire Protected Structure" after he made application therefor on a form (dated

at the top 25 September 1959) provided by the Commissioner's office, with signature line to be signed by "Owner" and filled in with "State of Missouri," but showing no one signing for the owner although there was an "X" for signature. The form showed the figures computing the fee (so much a cubic foot) and that the permit was received by Armistead. At the time Armistead received the permit (about 30 days after construction began), plaintiff's only relationship with the State was as general contractor to construct the hospital building. Date of permit was shown as 11–20–59. An "Occupancy Permit" dated November 20, 1959 on a Department of Public Safety—Division of Building and Inspection form and signed by the Commissioner, certified that the "property at 5390 Arsenal has complied with all provisions of the building code and other ordinances." The record does not reflect that City's building department went through the plans and specifications. They generally took at least two weeks to issue a permit after application was made. The City's engineer made a "structural analysis" of the plans. The evidence does not show the nature of the analysis or how long it took to prepare it.

After the permit was issued, City's Department of Public Safety's Division of Building and Inspection observed the work progress on December 4, 1959, June 13, 1960, November 17, 1960, October 13, 1960 and January 30, 1961. Only on June 27, 1960 did it note and comment as to any details (on outer beam rods, which the State inspector said he would see were installed as suggested by the City inspector). Armistead came in contact with city inspectors who inspected the job during the construction

2. The City asked the heating contractor to apply for a permit but he did not apply for or pay for a permit. The City never stopped his work. On another state construction job (the State Office Building in St. Louis) the contractor took out a permit and paid for it. However, the contractor on another state job (Malcolm Bliss Hospital in St. Louis) did not apply for and the City never gave or charged for a building permit. The evidence does

not reveal the nature of the contracts on either of these projects.

3. The State owned the land all during 1959 and from then to time of trial. St. Louis State Hospital was transferred by the City to the State in 1948, a historical fact of which we take judicial notice. The hospital is one of the state hospitals for the mentally ill. Section 202.020–1.

after he got the permit. The construction work lasted about two years.

On March 28, 1960, the Attorney General of Missouri gave his opinion that no city permit was required on a state job. A copy of this opinion, quoting at length City of Milwaukee v. McGregor, 140 Wis. 35, 121 N.W. 642, was sent with plaintiff's letter to City on March 29, 1960, demanding repayment of the fee.

The trial court in a memorandum opinion adopted the Attorney General's opinion as declaring the law applicable to this case (that the State does not have to comply with municipal codes or ordinances) and declared that the City had acted beyond its scope of authority in requesting application for the permit and demanding a fee from the State or anyone else to whom such permit could have been lawfully issued for the building construction; that plaintiff paid the fee under threat of having the job closed down; and that plaintiff had duly demanded refund.

The City's brief sets out the following points: (1) The contract required plaintiff to obtain and pay for all permits and thereby showed the State intended to comply with the city building regulations; and (2) Plaintiff is estopped to "deny" the contract provision requiring plaintiff to comply with the building code by obtaining and paying for all permits and is not the proper party to claim the state's exemption, if any, from such regulations. The City argues that Article 8 of the general conditions was a reasonable condition and procedure and that plaintiff agreed to follow it by contracting with the State; that the State had the right to specify how a building is to be constructed, and in this case required plaintiff to comply with city building regulations; and that it would violate this contract if plaintiff is relieved from complying with it as respects permits and fees. It cites Kansas City v. Fee, 174 Mo.App. 501, 160 S.W. 537; Wellston Fire Protection District of St. Louis County v. State Bank & Trust Company of Wellston, Mo.App., 282 S.W.2d 171; Kansas City v. School District of Kansas City, 356 Mo. 364, 201 S.W.2d 930; and Community Fire Protection District of St. Louis County v. Board of Education of Pattonville School Dist. R–2, Mo.App., 315 S.W.2d 873, all dealing with *where the* legislature intended to place the power as between governmental subdivisions, taking into account, among other things, the objectives of the legislation.

The City relies heavily on *Fee*, where a janitor in charge of a public school's steam-heating boiler was held subject to a city ordinance requiring persons in charge of such a boiler to be a fireman or engineer licensed by the city. A school board rule enjoined the janitor of a steam-heated building to have an engineer's license "as required by city ordinance." The court, viewing such rule as admitting that enforcing the ordinance would not interfere with the board's work of education, concluded that it did not lie in the janitor's mouth to urge the contrary. The board's rule related solely to the janitor's qualifications. Section 33 does not require that a general contractor be licensed. Article 8, as we construe it herein, does not admit that Section 33 would not interfere with the State's project. The city regulation in *Fee* was outside the work of education. Here, the ordinance, if applied, affects directly the State's building on its own land. In *Fee* the statute gave the board the narrow power of "supervision of instruction," but no police power. The State inherently has complete police power and, as pointed out later herein, has commanded the Department and the Chief to plan and erect the hospital building. A city permit is not necessary to follow out such command. Watson Const. Co. v. City of St. Paul, 260 Minn. 166, 109 N.W.2d 332, 334. *Fee*, as just distinguished, is not persuasive in favor of the City.

Plaintiff's brief asserts that the only question is whether City can impose a building permit fee against the State and that if the answer is "No," then the trial court was correct in its judgment for plaintiff; and that the contractor is not the legal

owner and is not designated as the authorized agent of the owner in its contract with the State and that the ordinance applies only to the legal owner or an authorized agent for the State as owner and not to the contractor.

Plaintiff's brief argues that the City had no power to make regulations or ordinances affecting the State's police powers, relying principally on *McGregor*, supra, and City of Fulton v. Sims, 127 Mo.App. 677, 106 S.W. 1094. *McGregor* held that ordinary charter and ordinance regulations requiring submission to local supervision as regards the manner of constructing buildings do not apply to a building which state law, passed subsequent to the charter, commanded the state board of regents to erect without regard to the judgment of anyone outside of its own members, except as to approval of the plans by the Governor, because statutes in general terms do not apply to acts of a state and express authority to a state agency to do a particular thing in a particular way supersedes any local or general regulation conflicting therewith.

*Sims*, though distinguishable, deals, as we do here, with the question of where the State has placed power as between itself and one of its subdivisions (See Community Fire Prot. Dist. of St. Louis County, supra, 315 S.W.2d 1. c. 877, referring to *Sims*). Concluding that the State could and did retain the power there claimed by the municipality, the Court held that an ordinance requiring that coal be weighed on city scales, if applied to coal sold to a State hospital, would interfere with the hospital's performance of its statutory duty to make purchases for itself. Here, the question is whether the ordinance interferes with state officials in their statutory duty to erect the hospital with the assistance of a private general contractor. The City here, just as in *Sims*, had no right to "weigh on its scales" plaintiff's services. Such was to be solely a matter on which the State retained the power. In both, a city asserts authority superior to the state over the latter's

governmental functions. *Sims* denied such authority. We do likewise, for the reasons we discuss below.

For purpose of this opinion the Court assumes that Section 33 was intended to apply to a general contractor in plaintiff's position in this case. Parenthetically, we express considerable doubt whether it was so intended. Compare City of St. Louis v. J. E. Kaime & Bro. Real Estate Co., 180 Mo. 309, 79 S.W. 140, 142, where the word "owner" was held not to apply to an agent within the meaning of an ordinance requiring owners to remove dangerous buildings at their own expense, on the grounds that otherwise a person with no substantial interest in the property would be penalized and that extending the requirement to agents was not a reasonably necessary incident to the express power granted. See Ex parte Means, 14 Cal.2d 254, 93 P.2d 105, 107, 123 A.L.R. 1378 (court will not assume city council legislative intention to interfere with acts of a state). See also City of Charleston v. Southeastern Const. Co., 134 W.Va. 666, 64 S.E.2d 676.

■　The issues herein distill into the question of whether the State has by legislation or by its contract with plaintiff empowered the City to impose the permit fee on plaintiff. We first inquire whether legislation thus empowered the City. On this, we turn to the well-established principle that an ordinance does not apply to a state with reference to its own property unless the charter expressly gives the city authority to bind the state or the state waives its right to regulate its property. See: *McGregor*, supra, 121 N.W. 1. c. 643; New Jersey Interstate Bridge and Tunnel Comm. v. Jersey City, 93 N.J.Eq. 550, 118 A. 264, 266–267 (city may not compel state or its general contractor to take out a permit); City of Medford v. Marinucci Bros. & Co., Inc., 344 Mass. 50, 181 N.E.2d 584, 587; Township of Springfield v. New Jersey State Highway Dept., 91 N.J.Super. 567, 221 A.2d 766, 775; Davidson County v. Harmon, 200 Tenn. 575, 292 S.W.2d 777, 781; Kentucky Institute, etc. v. City of

Louisville, 123 Ky.Law Rep. 767, 97 S.W. 402, 403–404; City of Atlanta v. State, 181 Ga. 346, 182 S.E. 184, 185; Ex parte Means, 14 Cal.2d 254, 93 P.2d 105, 107; Board of Regents, etc. v. City of Tempe, 88 Ariz. 299, 356 P.2d 399, 406; Watson Const. Co. v. City of St. Paul, supra. The state and its agencies are not within the purview of a statute unless an intention to include them is clearly manifested, especially where prerogatives, rights, titles, or interests of the state would be divested or diminished or liabilities imposed on it. Hayes v. City of Kansas City, 362 Mo. 368, 241 S.W.2d 888, 892.

The City's charter, which we judicially notice as required by the 1945 Missouri Constitution, Art. VI, Sec. 33, gave the City power "to regulate the construction and materials of all buildings and structures," (Art. I, Sec. 1(29)); "to do all things whatsoever expedient for promoting or maintaining the comfort, education, morals, peace, government, health, welfare, trade, commerce or manufacture of the City or its inhabitants," (Art. I, Sec. 1(33)); and "to exercise all powers granted or not prohibited to it by law for which it would be proper for this charter to enforce" (Art. I, Sec. 1(35)). It did not expressly or by necessary inference empower the City to regulate construction of state buildings on state land in the City. We find no constitutional or legislative authority for such regulation. The legislation we will now refer to shows a legislative intent to retain such authority and power exclusively for the State.

The scope and purpose of the Department, so far as pertinent here, is to improve and protect the health of the people of the State and to care for the mentally ill and those who are ill from other causes "so far as the laws of Missouri shall provide," Sec. 191.010. It was established as required by Art. IV, ¶ 37 of the 1945 Constitution, which declares that the health and general welfare of the people are of primary public concern and that the General Assembly may grant power "with respect thereto" to counties, cities, and other political subdivisions of the State. By Sec. 191.120 title to property assigned to it vests in its director as trustee for and on behalf of the State. Section 192.260 designates its division of health as the official state agency to receive federal and other grants and aids for making a survey and for construction of hospitals. Section 8.220, Laws 1957, p. 726, ¶ 1 required the Department to "strictly comply with the act appropriating the money." The Department was, thus, required to construct the hospital with approved safety features for eliminating fire and other hazards, as provided in the appropriation bill (H.B. 270, p. 9, Sec. 13, Laws 1959).

The Chief, appointed as required by law by the Governor, served as advisor and consultant to all department heads in obtaining architectural plans, letting contracts, and supervising construction. No contracts for construction could be let or any construction projects under contract be accepted for payment without his approval. Laws 1958, 2d Ex.Sess., p. 183, ¶ A(7).[4] He had the duty to set forth reasonable conditions to be met and procedures to be followed in the construction of state facilities, which were to be codified and filed with the Secretary of State (Sec. 8.080),[5] and approved by the Director of Revenue (Sec. 32.050 (13)).

4. Same as Sec. 8.310, R.S.Mo.1959, cited by the City.

5. Same as Sec. 8.320, R.S.Mo.1959, cited by the City. Such conditions and procedures were not in evidence. The court cannot take judicial notice of them. Moss v. Wells, Mo., 249 S.W. 411; Nabors v. United Realty Co., Mo.App., 298 S.W.2d 474. The court assumes that the Chief performed his duties to codify and file such conditions and procedures, and that they were complied with on this job, such compliance being necessary before payment to plaintiff could be properly made. Sec. 8.320. See Hall v. City of Taft, 47 Cal.2d 177, 302 P.2d 574, 580, for similar powers and duties given to division of architecture of state department of public works.

■ The foregoing legislation delegated plenary power and duty to state officials with respect to construction of state hospital buildings.[6] Such grant of specific power is deemed to deny contrary power. Community Fire Prot. Dist. of St. Louis County, supra, 315 S.W.2d 1. c. 877. The City's charter must yield to such legislation. Board of Education v. City of St. Louis, 267 Mo. 356, 184 S.W. 975. Compare People v. Roe, 40 Misc.2d 924, 243 N.Y.S.2d 950, 952–953 (state superintendent of public works had "duty to supervise the construction" and, hence, City code requiring permit for storage of propane gas did not apply to employee of contractor on state hospital construction site, there being no legal or practical area for local concern). It is not reasonable to assume that the legislature intended to grant or delegate to the City the power and authority to override the State's sovereign prerogative. See *Harmon*, supra. To permit the City to graft its own building code onto such legislative requirements would introduce a potential element of discord and confusion into an area where the public interest of all the people of the State is so directly and importantly involved. Kaveny v. Bd. etc. of Montclair, 71 N.J.Super. 244, 176 A.2d 802, 804.

■ We move now to the City's contention that Article 8 "specifically" required plaintiff to obtain and pay for all permits, thereby showing the State intended to comply with the City's building regulations. The Court does not view Article 8 as "specifically" so requiring. Article 8 is not specific as to whether Section 33 of the Code "required" plaintiff, as general contractor, to do this nor does it specifically say that it considers such ordinance as "applicable." The word "applicable" is ambiguous and should not be construed to refer to the building permit which Section 33 "required" of private parties but not expressly on public buildings. Section 33, apart from the contract, would be considered inapplicable to a state job. *Marinucci*, supra, 181 N.E.2d 1. c. 589. The language does not clearly include an ordinance which would intend to charge the State (by charging its general contractor) a substantial amount for the City's consent to the State to erect a state building on its own land.

If Article 8 is construed as urged by the City, and the City's building regulations differed from those of the State, the application of the ordinance could very well interfere with the State's construction project. As noted in *Wellston*, supra, 282 S.W.2d 1. c. 175, if two governmental authorities (here the State and the City) see fit to prescribe different requirements making compliance with both impossible, this would lead to an unreasonable result not intended by the legislature. The construction contract provision that the project conform with city ordinance requirements indicates no more than that the State was providing certain specifications for the building. To construe it as meaning that the State was subjecting itself to the power of the City to grant or deny its right to proceed with construction if its contractor did not pay for a building permit would not be a reasonable way to interpret the contract, especially when considered in light of the statutory authority and duties given to the Department and the Chief, the absence of any statute expressly giving the City such power, and the absence of wording in the ordinance clearly applying to the situation in this case.

Central authorities such as the Department and the Chief, responsible to state officials rather than to officials of each municipality, are appropriate for the efficient, uniform, and orderly administration

---

6. The court does not attempt to pinpoint whether the construction project was authorized by one or more specific statutes or by the general appropriation act mentioned above. The specific statutes indicate, however, an intenton to give the state authorities broad and particularized

and regulatory powers over the construction of state buildings, completely free of municipal control. Compare Board of Regents of Universities v. City of Tempe, 88 Ariz. 299, 356 P.2d 399, 406 (Footnote 1).

of the State's system of planning and erecting state buildings responsible to the needs of all of the people of the State. *City of Tempe, supra,* 356 P.2d l. c. 407; *Kaveny, supra,* 176 A.2d l. c. 803.

They will, without any local control, plan for and supervise the construction of state buildings with no less concern for the soundness and safety of the building than the local municipality. They may follow desirable local building specifications, without requiring that the contractor (and, therefore, the State indirectly) pay a substantial building permit charge to the City. If they wish to obtain and pay for safety, engineering, and inspection services by a city, they should expressly so provide in the construction contract.[7] This was done in Watson Const. Co. v. City of St. Paul, 260 Minn. 166, 109 N.W.2d 332, the only case we have found in which a contractor on a state construction job has sought recovery of a building permit fee paid to a city under protest. There, the contract provided: (l. c. 333)

" 'Each contractor shall take out building permits and licenses and pay for same as required by the City of St. Paul Building Code and State of Minnesota laws for comparable work performed on private building projects. *Where codes provide that the owner shall take out and pay for permits, each contractor shall perform these duties for the State and include the cost of the same in his proposals.' "* (Emphasis supplied.)

The Court, affirming judgment against the contractor on the ground that the State could and did waive its sovereignty, reasoned that the State received services from the City, including advice from the City's architect during the preliminary planning of the building, checking of final plans, and frequent inspections during construction both as to plaintiff's work and as to the work of the State's other contractors. Here the State received no such benefits from the City. The *Watson* contract expressly obligated the contractor to act for the State for its cost where the city code provided that "The owner shall take out and pay for permits." Article 8 makes no such express provision. The Court conceded that if the State omitted such requirement or indicated that the city code provisions were not to be observed, a city permit would have been unnecessary and the fee therefor could not have been lawfully collected, 109 N.W.2d l. c. 334. The Court noted that the contractor undertook to assume an obligation which he sought to avoid in the law suit. The *Watson* contractor, unlike plaintiff here, did not deny that payment of the permit fee was a condition of the contract.

The Court will not presume that the state officials intended by Article 8 to give the City power to interfere with or delay the contractor in promptly performing his duty to assist the State in exercising its sovereignty over its own property. See, to the effect that similar contract provisions do not give a city such authority: *Marinucci, supra,* 181 N.E.2d l. c. 589 (contract calling for compliance with all municipal ordinances and regulations which would be otherwise inapplicable to the contractor on land of the Commonwealth, and which

7. Requiring the State's contractor (who is acting for it and in one sense, therefore, is the State itself) to pay for a permit even though he abides by all city building code safety and structural requirements would increase the State's cost, a relevant factor, as noted in Township of Springfield, supra, 221 A.2d l. c. 771–772. We do not decide whether the Department and the Chief could properly do this without constitutional or legislative consent (See Hall v. City of Taft, 47 Cal.2d 177, 302 P.2d 574, 578) or without getting a reasonably equivalent return in services from the City. We note, however, the principle that neither the legislature nor any inferior body to which a portion of the state's police power is granted may alienate, surrender, or abridge the State's right to exercise such power by grant, contract, or delegation. Handlan-Buck Co. v. State Highway Commission, Mo., 315 S.W.2d 219, 223; State ex rel. Taylor v. Anderson, 362 Mo. 513, 242 S.W.2d 66.

would frustrate, or even only hinder, performance of the contract); New Jersey Interstate Bridge, supra, (contractor obligated to strictly comply with all ordinances and regulations "applicable to" the work); *Kaveny*,[8] supra; *Township of Springfield*, supra, 221 A.2d l. c. 774; Hall v. City of Taft, 47 Cal.2d 177, 302 P.2d 574, 582.

■ We conclude that the State did not in its contract with plaintiff waive its sovereignty or admit that for plaintiff to obtain and pay for a building permit under Section 33 would not interfere with the construction project. Even if the contract is construed to so obligate plaintiff, the City, not being a party to the contract, was only incidentally, indirectly or collaterally benefited by it. *Marinucci*, supra, 181 N.E. 2d l. c. 589; New Jersey Interstate Bridge, supra, 118 A. l. c. 265–267; Township of Springfield, supra, 221 A.2d l. c. 772. This being so, the City has no right to recover upon the contract. Stephens v. Great Southern S. & L. Ass'n., Mo.App., 421 S.W.2d 332, 335–336. Nor may it rely on the contract as defensive matter. New Jersey Interstate Bridge, supra, 118 A. l. c. 266–267.

■ The City suggests that it properly charged and is entitled to retain the permit fee because the State got the benefit of the City's technical and inspection assistance, in return for a reasonable fee (citing *Kansas City*, supra, 201 S.W.2d l. c. 934). We deem this of no aid to the City, in view of the statutes entrusting powers to the Department and the Chief, the lack of express authority in the charter, our construction of Article 8, and the absence of proof of substantial benefit to the State or plaintiff from compliance with the City's ordinance.

■ The City contends that only the State, and not plaintiff, may complain that the State is being interfered with by requiring plaintiff to conform with the contract. We do not agree. It would be in-consistent to hold that plaintiff general contractor, an agent of the State, is subject to municipal control where the State itself and agencies are immune from such regulation. Township of Springfield, supra, 221 A.2d l. c. 774 (where the court reasoned that otherwise the court would be ruling indirectly that the State itself does not enjoy the immunity); *Marinucci*, supra, 181 N.E.2d l. c. 588. Plaintiff is the real party in interest within the meaning of Civil Rule 52.01, which is to enable those (as plaintiff here) directly interested in the subject matter of litigation and entitled to reap its fruits to maintain the action. Smith v. Cowen, Mo.App., 350 S.W.2d 96, 98.

No legislation or contract provision empowered the City to require plaintiff to obtain or pay for the permit. Plaintiff paid under protest and demanded repayment. Plaintiff is entitled to recover the amount paid. The judgment below should be and is affirmed. Plaintiff's appeal in 33,136 is dismissed.

WOLFE, P. J., and BRADY, J., concur.

---

8. For contract provisions, see 69 N.J.Super. 94, 173 A.2d 536, 537–538.