Arden ENGELAGE, Hubert Kluesner, and Dan Hampson, Commissioners of Warren County, Missouri, Appellants,

v.

CITY OF WARRENTON, Missouri, Respondent.

No. ED 97965.

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 18, 2012.

Kent Munson, St. Louis, MO, for appellants.

Daniel G. Vogel, Erin P. Steele, Christopher B. Graville, Chesterfield, MO, for respondent.

Joseph G. Lauber, Lee's Summit, MO, Ivan L. Schraeder, St. Louis, MO, Amici Curiae.

LAWRENCE E. MOONEY, Presiding Judge.

May the City of Warrenton, in the exercise of its police powers, require Warren County to comply with city building codes in the construction of the county's new administration building within the city limits? We hold that the city may, and thus affirm summary judgment entered in favor of the city.

### Factual and Procedural Background

Two political subdivisions of the state find themselves at loggerheads. Warren County is a county of the third class in the State of Missouri; the City of Warrenton is a city of the fourth class, wholly located within the boundaries of Warren County. Each claims superior rights in the delegation of governmental power from the state. The county, with statutory authority to build a building, contends it may do so virtually unfettered. The county posits that the city's authority is limited to regulating the erection and maintenance of hitching posts, sidewalks, guttering, curbing, and the other street-related improvements listed in Section 88.743 of Missouri's Revised Statutes.[1] The city, on the other hand, contends it has authority to regulate all of the county's construction activities by virtue of the city's police power.

The essential facts leading to this dispute are few and undisputed. Warren County decided to build a new county administration building on property located within the city limits of the City of Warrenton.[2] The city has enacted building

1. Section 88.743 reads:
   All real estate owned by a county and situated within the corporate limits of any city of the fourth class shall be subject to the provisions of all ordinances of such city which relate to the erection and maintenance of hitching posts, sidewalks, guttering, curbing, fences along streets and alleys, and the paving and macadamizing of streets to the same extent as that of private citizens of such city.

2. Plaintiffs-appellants—Arden Engelage, Hubert Kluesner, and Dan Hampson—are the duly-elected county commissioners of Warren County.

code ordinances requiring building permits for the construction of buildings in the city. The city charges certain fees in connection with these various permits. The county had constructed other buildings within the city limits in the past, dating back to at least 1995. On at least six of those occasions, the county had applied for building permits, and had paid the associated fees, without protest or claim of preemption.

In 2009, when the county learned of the city's plan, the city notified the county that, pursuant to the city code, the county must obtain and pay for various building permits from the city before commencing construction of the new administrative building. The county objected, informing the city that it would not be applying for or obtaining a building permit because it was not legally required to do so. The parties then exchanged a series of communications. The city asked the county to provide authority for its position and to clarify its change in position from what the city described as a mutual understanding between the city and the county, whereby the county had agreed that the city, in the exercise of its police powers, had the authority to require the county to submit an application for a building permit and to pay the appropriate fees. The city indicated a willingness to resolve any misunderstandings, but also expressly noted that it intended to exercise its police powers to ensure the safety and general welfare of its citizens. In response, the county cited Section 88.743 and admitted it needed a permit for the street-related improvements listed in that statutory section. But the county asserted that the city had no authority to require an application for a

building permit from the county for any other construction related to the building. Continuing, the county stated that, even though it was not required to obtain or pay for a building permit for construction of any improvements not listed in Section 88.743, it was willing to apply for a building permit in order to maintain the good relationship that had previously existed between the city and the county. The county re-emphasized, however, that it would not pay any fees for this permit other than those required by Section 88.743. Unwavering, the city again informed the county that it must obtain and pay for all the required building permits. The city also informed the county of the sanctions for failure to comply with the city code.[3]

Without applying for or obtaining any permits, the county commenced construction by having its contractor mobilize its equipment at the site and begin to grade the building site. The city building inspector went to the site on October 15, 2010, and issued a stop-work order because the county had begun construction and grading in violation of the city's building and safety code. The inspector returned to the site a few hours later and the county had not ceased construction, in violation of the stop-work order. The inspector informed the contractor and county commissioner Engelage, who was on-site, that construction must be stopped. The inspector returned to the site a third time to find that the county had still refused to stop construction activity. At this time, the inspector issued a municipal ordinance violation citation to the contractor, for violating the city's building and construction codes.

---

3. The city code provides that any person who violates the provisions of the building code is guilty of a misdemeanor punishable by a fine of not more than five-hundred dollars or by imprisonment not exceeding ninety days, or both fine and imprisonment. Each day that a violation continues is deemed a separate offense under the code. City Building Code Section 500.090.

■ The county stopped construction, and submitted building permit applications and grading plans to the city. The county also paid for the various building permits required by the city, but did so under protest. The city reviewed the applications and issued permits, and the county re-commenced construction of its new building.[4]

■ The county did not appeal to the city's building board, but instead filed the instant declaratory-judgment action in the circuit court.[5] The parties then each submitted motions for summary judgment based on their respective positions. The trial court entered judgment in favor of the city, and the county now appeals that decision.

### Standard of Review

We review the grant of summary judgment *de novo*. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Id.*; Rule 74.04.

### Discussion

■ We shall resolve the conflict between the two protagonists by examining the legislature's delegation of powers to each. Local governments, such as the county and city here, possess only those powers expressly delegated by the sovereign, and those necessarily or fairly implied in or incident to the powers expressly granted. *Premium Standard Farms, Inc. v. Lincoln Tp. of Putnam County*, 946 S.W.2d 234, 238 (Mo. banc 1997) (discussing general principle of law); *Christian County v. Edward D. Jones and Co., L.P.*, 200 S.W.3d 524, 527 (Mo. banc 2006) (counties); *City of Kirkwood v. City of Sunset Hills*, 589 S.W.2d 31, 35–36 (Mo.App. E.D. 1979) (municipal corporations).

■ When confronting adverse claims of two governmental units, each claiming to have the superior power, the court must construe the provisions delegating power together and harmonize them if reasonably possible to do so. *Kirkwood*, 589 S.W.2d at 42; *see also Appelbaum v. St. Louis County*, 451 S.W.2d 107, 112–13 (Mo.1970). Courts shall ascertain the intent of the legislature from the plain and ordinary meaning of the language used and to give effect to that intent, if possible. *Bd. of Educ. of the School Dist. of Springfield R–12 v. City of Springfield*, 174 S.W.3d 653, 660–661; *Devitre v. Orthopedic Center of St. Louis, LLC*, 349 S.W.3d 327, 331 (Mo. banc 2011).

4. Although the county has obtained permits, we hold that the matter is not moot because the county paid the fees under protest. Thus, the county and the city each still assert entitlement to the fees.

5. The city's building code provides that appeals of orders, decisions or determinations made by the building commissioner, relative to the application and interpretation of the code, are to be heard by the city's building board. Although the county did not appeal to the building board, we hold it was not required to exhaust the available administrative remedies before seeking review by the court.

No adequate remedy would lie through the administrative process. The parties would not resolve their differences, such that review by the court would be unnecessary. Furthermore, factual questions do not require determination, the record does not further development, and the board's expertise is not needed to resolve the instant dispute. The issue presented is purely a question of law, clearly within the realm of, and to be decided by, the court. *See Premium Standard Farms v. Lincoln Tp. of Putnam County*, 946 S.W.2d 234 (Mo. banc 1997).

We therefore turn to these delegations of power. The county relies on Chapter 49 of Missouri's Revised Statutes, which pertains to county commissions and county buildings. The county asserts the chapter contains a plenary grant of authority to build a county building. In particular, the county relies on two sections of that chapter—Sections 49.270 and 49.470. Section 49.270 states, in part, that the county commission "shall have control and management of the property, real and personal, belonging to the county...."[6] Section 49.470 provides, in part, that the county commission has the power "to build any county buildings...."[7] The legislature penned the delegation of power in broad terms. Possessing such authority, however, does not mean it cannot be limited or otherwise regulated. *Springfield,* 174 S.W.3d at 660.

The city relies on its police powers. Police power is "the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society." *State ex rel. Rouveyrol v. Donnelly,* 365 Mo. 686, 285 S.W.2d 669, 674 (1956) (citing 16 C.J.S. *Constitutional Law,* § 174, p. 537). "The function of police power is to preserve the health, welfare and safety of the people by regulating all threats harmful to the public interest."

*State v. Richard,* 298 S.W.3d 529, 532 (Mo. banc 2009). Preservation of the public health is a paramount end of the exercise of the police power of the state. *Mahoney v. Doerhoff Surgical Services, Inc.,* 807 S.W.2d 503, 507 (Mo. banc 1991); *Craig v. City of Macon,* 543 S.W.2d 772 (Mo.1976); *City of Kansas City v. Jordan,* 174 S.W.3d 25, 41 (Mo.App. W.D.2005).

A city has no inherent police power. *State ex rel. Sims v. Eckhardt,* 322 S.W.2d 903, 906 (Mo.1959); *Tietjens v. City of St. Louis,* 359 Mo. 439, 222 S.W.2d 70, 73 (1949); *Jordan,* 174 S.W.3d at 41. "Exercise of the police power is a governmental function, the control of which remains in the state." *Tietjens,* 222 S.W.2d at 73. The only police power a city enjoys is that conferred to it by the state. *Jordan,* 174 S.W.3d at 41. A city's authority to exercise police power must come from a specific delegation by the state or in some cases from the express or fairly implied powers of its charter. *Tietjens,* 222 S.W.2d at 73; *Clifford Hindman Real Estate, Inc. v. City of Jennings,* 283 S.W.3d 804, 809 (Mo.App. E.D.2009).

The legislature has generously delegated such power. Section 79.110 contains the statutory delegation of police powers to municipalities of the fourth class, such as Warrenton.[8] *Miller v. City of Town &*

6. In full, Section 49.270 reads:

The county commission shall have control and management of the property, real and personal, belonging to the county, and may purchase, lease or receive by donation, or to refuse donation of, any property, real or personal, for the use and benefit of the county, and may sell and cause to be conveyed any real estate, goods or chattels belonging to the county, appropriating the proceeds of such sale to the use of the same, and to audit and settle all demands against the county.

7. In full, Section 49.470 reads:

The county commission of each county shall have power, from time to time, to alter, repair or build any county buildings, which have been or may hereafter be erected, as circumstances may require, and the funds of the county may admit; and they shall, moreover, take such measures as shall be necessary to preserve all buildings and property of their county from waste or damage.

8. Section 79.110 defines the powers and duties of mayors and boards of alderman as follows:

The mayor and board of aldermen of each city governed by this chapter shall have the

*Country,* 62 S.W.3d 431, 437 (Mo.App. E.D.2001). This grant of authority permits Warrenton to exercise general police powers and to pass ordinances for the health and safety of its citizens. *Id.* Chapter 79, the chapter pertaining to fourth-class cities, records numerous other delegations of power.[9] Importantly, the legislature has specifically provided that the board of alderman of a fourth-class city may "regulate and control the construction of buildings … and may provide for the inspection of the same." Section 79.450.4.[10]

Accordingly, the city has enacted a building code. Courts have long recognized that building regulations by a municipality are an exercise of the police power. *Fleming v. Moore Brothers Realty Co.,* 363 Mo. 305, 251 S.W.2d 8, 15 (1952); *State ex rel. Walmar Inv. Co. v. Mueller,* 512 S.W.2d 180, 185 (Mo.App.1974); *Jordan,* 174 S.W.3d at 40. The county admits that Section 79.450 gives the city general health, welfare and safety powers to regulate and control building construction within its boundaries. But the county denies that it is subject to such authority as another subdivision of the state. The county theorizes this because Section 79.450 does not specifically authorize a city to regulate

the construction of a county-owned building. The county argues that the city may not interfere with or regulate the duly-authorized activities of the State or any of its other subdivisions unless the state constitution or a state statute specifically and expressly grants such power or authority.

The county cites five cases to support its claimed freedom from the city's building regulations: *Paulus v. City of St. Louis,* 446 S.W.2d 144 (Mo.App. E.D.1969); *Board of Education of the School Dist. of Springfield R–12 v. City of Springfield,* 174 S.W.3d 653 (Mo.App. S.D.2005); *City of Vinita Park By and Through Bd. Of Directors v. Girls Sheltercare, Inc.,* 664 S.W.2d 256 (Mo.App. E.D.1984); *City of Kirkwood v. City of Sunset Hills,* 589 S.W.2d 31 (Mo.App. E.D.1979); and *Appelbaum v. St. Louis County,* 451 S.W.2d 107 (Mo.1970). We find these cases inapposite because they either involve attempts by a political subdivision to regulate the State or they are an attempt by a political subdivision to regulate pursuant to their zoning powers.

In *Paulus,* a general contractor for the State of Missouri challenged the right of the City of St. Louis to retain amounts paid under protest for a building permit relating to a state-constructed building on

care, management and control of the city and its finances, and shall *have power to enact* and ordain *any and all ordinances* not repugnant to the constitution and laws of this state, and such *as they shall deem expedient for* the good government of the city, the preservation of peace and good order, the benefit of trade and commerce and *the health of the inhabitants thereof* and such other ordinances, rules and regulations as may be deemed necessary to carry such powers into effect, and to alter, modify or repeal the same. (Emphases supplied.)

9. *See, e.g.,* Section 79.450.6 (providing that the board of aldermen "may enact or make all ordinances, rules and regulations necessary to carry out the purposes of this chapter"); Sec-

tion 79.450.7 (providing that the board of alderman may "enact or make all ordinances, rules and regulations, not inconsistent with the laws of the state, expedient for maintaining the peace, good government and welfare of the city and its trade and commerce").

10. The legislature has also allowed that the board of alderman may "provide by ordinance limits within which no building shall be constructed except of brick or stone or other incombustible materials, with fireproof roofs, and impose a penalty for the violation of such ordinance, and may cause buildings commenced, put up or removed into such limits in violation of such ordinance, to be removed or abated." Section 79.450.4.

state-owned land within the city limits. This Court, in affirming judgment for the State, held that while the city's charter gave St. Louis authority to regulate the construction and material of buildings, no constitutional or legislative authority existed that empowered the city to regulate construction of state buildings on state land within the city. *Paulus,* 446 S.W.2d at 151. We relied upon the well-established principle that a state and its agencies are not to be considered as within the purview of a statute or ordinance, however general and comprehensive the language of such act may be, unless an intention to include them is clearly manifest, as where they are expressly named therein, or included by necessary implication. *Id.* at 150. This rule "reflects the notion that the state is a unique entity in our society as the reservoir of the power and rights of all people." *Carpenter v. King,* 679 S.W.2d 866, 868 (Mo. banc 1984). "Narrowly construing the general provisions of a statute in favor of the state serves to preserve the state's sovereign rights and protect its capacity to perform necessary governmental functions." *Id. Paulus* stands for the proposition that the city, as a political subdivision of the state, cannot subject the State of Missouri to ordinances without a specific statutory or constitutional grant of authority. The case has nothing to do with a contest between two subdivisions of the State.

In *Springfield,* the Springfield School District and Greene County each claimed that they need not submit their plans to the city's planning and zoning commission for approval. The school district planned to expand a parking lot at a high school, as well as closing and/or relocating certain public school facilities within the city. The county planned to develop property it owned within the city. The city, on the other hand, claimed that the state statute authorizing the city to engage in zoning and planning, Section 89.380, gave it the right to regulate both the school district and the county. The court held that the school district was subject to the provisions of Section 89.380, and thus must submit its plans, because the statute specifically provided that the city could regulate public facilities administered by a "board." *Springfield,* 174 S.W.3d at 661. The court found the school board could still exercise its constitutional and statutory duties without conflicting with Section 89.380 by submitting the board's plans to the zoning commission. The court reached a different decision with regard to the county. Looking at the language and the history of Section 89.380, the court noted that the legislature had omitted the terms "commission" and "body" from the statute.[11] Consequently, because the statute did not purport to relate to a county or commission, the court held that Section 89.380 did not give the city the ability to regulate the purchase, improvement or otherwise affect property of the county. *Springfield,* 174 S.W.3d at 662.

Similarly in *Vinita Park,* this Court held that the city, which was not a constitutional charter municipality but a fourth-class city like Warrenton, could not use its limited zoning power to prevent the agent of St. Louis County from building and operating a group home within a restricted, single-family residential area in the city. *Vinita Park,* 664 S.W.2d at 260–62. We noted that the zoning power granted to the city pursuant to the Zoning Enabling Act, Chapter 89, the sole source of municipal zoning authority for cities, town, and vil-

11. Section 89.380 was modeled on Title I, Section 9 of the Standard City Planning Enabling Act of 1928. That section includes the terms "counties" and "commissions," whereas Missouri's statute does not.

lages, was limited by the very terms of the act to "buildings, structures and land for trade, industry, residence or other purposes." Section 89.020.[12] In accordance with a long line of decisions, we held that this limited delegation of power did not empower the city to restrict or limit the use of public property for public purposes. *Vinita Park*, 664 S.W.2d at 260.

Yet again, in *Kirkwood*, this Court held that the municipal ordinances of Sunset Hills could not limit or abrogate Kirkwood's statutory authority to acquire property within one mile of city limits for use as a public swimming pool and recreational facility. *Kirkwood*, 589 S.W.2d at 43. In reaching this decision, we construed the two grants of authority—the delegation of the state's power to cities to acquire land for park purposes in Section 90.010, and the delegation of zoning power in the Zoning Enabling Act, Chapter 89. As to Section 90.010, we found no specific provision in that statutory section indicative of any intention by the General Assembly that the exercise of the power to acquire land for parks should be subject to zoning regulations of any host county or municipality. *Id.* at 42. In contrast, the power to regulate granted by the Zoning Enabling Act, by the very terms of the act, was limited and did not include the power to restrict or limit the use of public property for public purposes. *Id.*

*Appelbaum* is the final case cited by the county in support of its proposition that the State and its subdivisions are free from regulation from other subdivisions of the state, unless the state constitution or a state statute specifically grants such authority. In *Appelbaum*, the Villages of St. John and Bel–Ridge, through their zoning ordinances, sought to prohibit St. Louis County from constructing an incinerator and landfill upon county-owned land located within the two municipalities. St. Louis County, much like Warren County here, asserted that it was given statutory authority to build incinerators and that the municipalities did not have any specific statutory authority to restrict any aspect of the proposed construction. The Missouri Supreme Court held that the authority of the county to acquire land and to construct an incinerator was not subject to the municipalities' zoning ordinances. *Appelbaum*, 451 S.W.2d at 112. In so ruling, the Court looked to the two delegations of power. The Court first noted that the statutes conferring public-health power upon the county to acquire land for construction of an incinerator and accompanying landfill did not restrict the county's exercise of that power to only unincorporated areas. *Id.* at 112. Conversely, the Court noted that the Zoning Enabling Act, upon which the municipalities relied for their grant of regulatory authority, was limited by its terms and contained no express grant of power to either of the municipalities to restrict the power given the county to select sites for incinerators and landfills for the enhancement and protection of public health in all of St. Louis County. *Id.* at 113.

On first blush these cited zoning cases could generally be read as supporting the county's proposition that the city needs express statutory authority to regulate the county's building activities. The county, however, misconstrues the cases. The courts were not applying some broad overarching proposition that a city may not regulate a county absent an express grant

---

**12.** Section 89.020 provides in pertinent part, that for the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of the city is em- powered, among other things, to "regulate and restrict ... the location and use of buildings, structures and land for trade, industry, residence or other purposes."

of such authority over a county entity. Instead, the courts carefully considered the legislature's competing delegations of authority in order to determine the scope of power one political subdivision had to regulate another. The county ignores the fact that the authority claimed by the cities in the cited cases derives from a different grant of power than that claimed by the city here. In *Springfield* and the other cited cases, the cities relied upon the power granted to them by Chapter 89, the Zoning Enabling Act. Here, the city relies upon the power to regulate and control the construction of buildings within its boundaries, granted to them by Section 79.450. These two delegations of power differ markedly. This is not to say that a municipality's zoning power is a "second-rate" power. Both delegations of power are delegations of police powers—and they coexist. *See Eckhardt*, 322 S.W.2d at 906; *Wrigley Properties, Inc. v. City of Ladue*, 369 S.W.2d 397, 400 (Mo.1963) (noting zoning constitutes an exercise of a state's police power); *accord Fleming*, 251 S.W.2d at 15 (noting zoning regulations and building regulations may remain in full force at the same time). Nor is this to say that one police power is just like any other police power, as the county would have. The powers derive from different grants of authority—and the courts must look to those grants to determine the extent of the power delegated. As noted above, the Zoning Enabling Act is limited by its terms. Section 79.450, on the other hand, is penned in broader terms. Thus, we cannot rely on the county's cited cases.

Section 79.450 provides that the board of alderman of a fourth-class city may "regulate and control the construction of buildings ... and may provide for the inspection of the same." Section 79.450.4. The General Assembly has authored this provision in broad, general terms, without restriction or exception. Importantly here, the legislature has granted cities broad authority to regulate construction of buildings generally, without qualification as to whether the building or owner is "private" or "public."

Again, this broad power is part of the police powers delegated by the state to the city, to be exercised for the welfare, health, and safety of the public. Courts have long held that the police powers of a city generally extend to all within its boundaries, including other political subdivisions of the state, and unless an express statutory exception is extended to those other political subdivisions or agents of the state they are subject to the ordinances of the city. *Bredeck v. Bd. Of Educ. of City of St. Louis*, 213 S.W.2d 889, 893 (Mo.App. 1948) and *Smith v. Bd. of Educ. of City of St. Louis*, 359 Mo. 264, 221 S.W.2d 203 (1949) (subjecting school district restaurants to city health code regulations); *see also Kansas City v. School Dist. of Kansas City*, 356 Mo. 364, 201 S.W.2d 930 (1947) (applying police powers of city relating to building facilities and inspection fees to school district); *State ex rel. Audrain County v. City of Mexico*, 355 Mo. 612, 197 S.W.2d 301, 303 (1946); *Kansas City v. Fee*, 174 Mo.App. 501, 160 S.W. 537 (1913) (rejecting argument that the school district was exempt from city ordinance regulating steam-heating within the school, said ordinance enacted pursuant to the city's police power to provide for the health and safety of its citizens). Indeed, the county has not cited one case, nor have we found any, where a third-class county was exempted from a city's building code. Missouri is not alone in subjecting counties to a municipality's police-power regulations. *See* 1–14 Antieau on Local Government Law § 14.01 (2nd ed. 2006) ("Local governments may impose police power controls upon counties operating within the local government") (citing *Cook County v. City*

*of Chicago,* 311 Ill. 234, 142 N.E. 512 (1924) and *Union County v. Benesch,* 103 N.J.Super. 119, 246 A.2d 728 (N.J.Super.A.D.1968)).

We find the *Kansas City* and *Fee* cases particularly persuasive that political subdivisions should be subject to a municipality's police power. In *Kansas City,* a city ordinance required inspection of boilers, elevators, and other building facilities and required payment of inspection fees. *Kansas City,* 201 S.W.2d at 930. The school district did not question the validity of the city's regulatory measure in their general application, nor did the school district object to the city inspecting the schools. The school district contended, however, that any fee it would pay would necessarily come from public funds raised by taxation, and as a school district it was immune from such taxation. *Id.* The Missouri Supreme Court rejected the school district's position. The Court acknowledged that a school district was immune from taxes or assessments, but held that the district was nevertheless subject to police power fees for inspections of school facilities by the municipality because it was the city that was "vested with the regulatory and supervisory responsibilities of the exercise of police power." *Id.* at 934. In so ruling, the Court noted that the delegation of police power to the city came without constitutional or statutory restriction. *Id.* The Court also reasoned that the school district, having no police power, had "not been expressly and specifically given full duty to attend to these responsibilities." *Id.* Thus, the Court found the legislature "content in the thought the measure to be taken are within the police power vested in the City." *Id.* Although recognizing the school district's express statutory authority to "acquire sites for and to construct and repair necessary schoolhouses," and to provide "proper heating, lighting, ventilation and sanitation," the Court held such authority was simply not an express

and specific statute granting full authority to the school district needed to supersede the city's general police power granted by the legislature. *Id.* at 933–34. The Court noted that it could be "reasonably urged" that the legislature was wise in "singly reposing such grave responsibilities" in the city, given the technical experience and advice of the city inspectors. *Id.* at 934. Concluding, the Court reasoned that the city's police powers were binding on the school district so as to avoid the "confusion possible in a dual responsibility" of the exercise of the police power. *Id.*

The court employed similar reasoning in *Fee.* There, the Court held that a school district employee, a janitor in charge of its steam-heating boiler, was subject to the city's ordinance requiring him to be licensed by the city. *Fee,* 160 S.W. at 540. In so ruling, the court noted that the laws vested in the public school authorities the "supervision of instruction," but nowhere gave them governmental police powers. *Id.* at 538. On the other hand, the law vested authority over police matters in the city, and such authority was given without restriction or exception. *Id.* The court reasoned that the qualification of one in charge of such a powerful piece of equipment capable of producing disastrous results was not a matter within the sphere of, or pertaining to, the work of education at all, but rather was wholly within the matters of police regulations confided alone to the city. *Id.* at 538. The Court specifically noted that requiring the janitor to comply with the city regulations did not interfere with the authority of the school board in its education work. *Id.* Rather, the court found that the school board's "control, management, direction, operation, and care of school property, the policy to be followed in school work, the teachers to be selected, and all other matters directly, or even merely incidentally, connected

with the subject of education in general is left free and untrammeled." *Id.*

Just as the competing delegations of authority in these cases differed, the authority granted by Chapter 49, upon which the county relies, is dissimilar to authority for health and safety purposes granted in Chapter 79. The power to build a building, which the county possesses, differs meaningfully from the power to ensure the building is constructed and operated in a safe manner. The county, however, contends the statutory framework of Chapter 49 contains a mechanism to ensure that the new building is properly constructed. The county notes that a superintendent supervises the erection of county buildings, and that the superintendent prepares and submits to the county commission for approval plans for the building, including its dimensions and the materials of which it is to be constructed. Sections 49.330 and 49.410. The county also observes that the contractor hired to construct the building must do so according to the approved plans. Sections 49.420 and 49.430. In particular, the county relies on the provision regarding the superintendent's supervisory duties as evidence that the statutory scheme of Chapter 49 protects the public.[13]

Thus, the county argues, pursuant to statute, the superintendent, under the direction of the county commission, ensures that the county building is erected properly and is safe. The county further asserts that because no other governmental body, political subdivision, or agency is mentioned in this statutory process and framework, no authority exists for a city to supplant the county's superintendent in directing or approving the work done on a county-owned building.

We reject the county's overreaching. We read these relied-upon provisions as merely a mechanism to ensure that a county building is built according to the contract and the approved plans. The authority here does not speak to protecting the public's safety. If Chapter 49 was intended to provide counties with the type of health and safety authority claimed by the county, there would be no need for Section 64.170, which pertains to control of construction by county commissions, and which was adopted "[fo]r the purpose of promoting the public safety, health and general welfare, to protect life and property and to prevent the construction of fire hazardous buildings . . . ."[14] Critically here,

---

13. The county relies on Section 49.440, which provides:

> The superintendent shall oversee and direct the execution of the work, and see that the materials employed are good, and that the work is executed according to contract, and make report of the progress and condition thereof, from time to time, to the county commission.

14. In full, Section 64.170 provides:

> 1. For the purpose of promoting the public safety, health and general welfare, to protect life and property and to prevent the construction of fire hazardous buildings, the county commission in all counties of the first and second classification, as provided by law, is for this purpose empowered, subject to the provisions of subsections 2 and 3 of this section, to adopt by order or ordi-

nance regulations to control the construction, reconstruction, alteration or repair of any building or structure and any electrical wiring or electrical installation, plumbing or drain laying therein, and provide for the issuance of building permits and adopt regulations licensing persons, firms or corporations other than federal, state or local governments, public utilities and their contractors engaged in the business of electrical wiring or installations and provide for the inspection thereof and establish a schedule of permit, license and inspection fees and appoint a building commission to prepare the regulations, as herein provided. 2. Any county which has not adopted a building code prior to August 28, 2001, pursuant to sections 64.170 to 64.200, shall not have the authority to adopt a building code pursuant to such sections unless the

Chapter 64 grants authority to regulate and control building construction only to county commissions of first- and second-class counties. The legislature did not grant such authority to third-class counties such as Warren County. The county simply has no police power to regulate the construction of buildings and has no power even to enact such regulations. We necessarily must conclude that the legislature intended to vest the city with this authority to protect public safety.

We additionally note that when the General Assembly granted building-code authority to higher-class counties, it expressly limited the power—unlike the building-code authority for cities—in that the statute expressly mandates that the authority shall not extend over "federal, state or local governments." If the legislature intended to limit a city from controlling the construction and permitting of county buildings, it certainly knew how to do so. Having granted authority to regulate building construction only to certain higher classes of counties, and then only with voter approval, and with the express limitation precluding authority over "federal, state or local governments," the legislature here vested the city, and the city alone, with the authority to protect public safety.

The county alternatively argues that even if the city has authority to regulate buildings built by a county, such authority is limited to those items specifically mentioned in Section 88.743, such as sidewalks,

guttering, curbing, and fences.[15] We reject the county's argument. We view this statutory section as nothing more than a coexistent power with that provided by Section 79.450.

Thus, we hold that the county is subject to the city's building code. The county may still exercise its statutory right to build a building without conflict with Section 79. To hold otherwise "would be to create little separate and independent kingdoms within the city where the sovereignty given to it by the state could not operate." *Fee,* 160 S.W. at 540.

We affirm the judgment for the city.

PATRICIA L. COHEN and KURT S. ODENWALD, JJ., concur.

---

**15.** In full, Section 88.743 reads:

authority is approved by voters, subject to the provisions of subsection 3 of this section.

. . .

3. The proposal of the authority to adopt a building code shall be voted on only by voters in the area affected by the proposed code, such that a code affecting a county shall not be voted upon by citizens of any incorporated territory.

