STATE of Missouri, at the Relation of ST. LOUIS UNION TRUST COMPANY, a Missouri Corporation, and Joseph Pulitzer, Jr., as Executors and Trustees under the Last Will of Joseph Pulitzer; Samuel J. Shelton, as Executor under Said Will; Michael Edgar Pulitzer, as Trustee under Said Will; Elizabeth Edgar Pulitzer; Joseph Pulitzer, Jr., and Louise V. Pulitzer, Relators,

and

City of Ladue, a Municipal Corporation, Intervenor,

v.

Honorable Franklin FERRISS, Judge of the Circuit Court of the 13th Judicial Circuit of the State of Missouri, Presiding in Division 6 of the Circuit Court of the County of St. Louis, Missouri, Respondent.

No. 46022.

Supreme Court of Missouri, En Banc.

July 8, 1957.

Rehearing Denied Sept. 9, 1957.

Richard O. Rumer, Daniel Bartlett, St. Louis, for relators.

Gilmore & McClintock, John L. Gilmore, Robert G. McClintock, St. Louis, for respondent.

Ziercher, Tzinberg, Human & Michenfelder, Erwin Tzinberg, Clayton, amici curiæ.

HOLLINGSWORTH, Judge.

This is an original proceeding wherein relators seek to prohibit the respondent, Judge of the Circuit Court of St. Louis County, from hearing and determining a suit brought by School District of the City of Ladue to condemn a 32.26-acre tract of land in said city as a site for the location and erection of a new schoolhouse. Respondent waived service of the provisional writ and the case was submitted upon the relators' petition and respondent's demurrer to the petition and motion to quash the provisional writ. Hence, the material facts are to be gleaned from the petition. The respondent judge, as is usual in prohibition proceedings, is represented by counsel for the party directly interested in sustain-

his jurisdiction, to wit: School District of the City of Ladue.

The City of Ladue is a city of the fourth class. School District of the City of Ladue, hereinafter generally referred to as "the school district", includes not only the whole of the city but also parts of eight surrounding incorporated cities and an unspecified extent of unincorporated area.

The site in question lies in the central area of the City of Ladue. It is a part of an 86-acre tract, known as "Lone Tree Farm", which was owned by the late Joseph Pulitzer at the time of his death. By the terms of his will, said farm was devised to trustees therein named to be held and maintained in its entirety as a residential estate for his widow so long as she should live, and it is now so occupied by her. The widow, the executors of the will of Joseph Pulitzer and the trustees therein named are relators herein, as are Joseph Pulitzer, Jr., and his wife, Louise V. Pulitzer, who own and occupy as their residence a 6-acre tract adjoining the site sought to be condemned and who are also the holders of an option to purchase a 3.6-acre tract adjoining their residence property and the site sought to be condemned. The relator trustees and relators, Joseph Pulitzer, Jr., and Louise V. Pulitzer, are also taxpayers on account of their ownership of the tracts above described and, presumably, it is in that capacity that Joseph Pulitzer, Jr., and Louise V. Pulitzer are joined as relators herein. The City of Ladue was permitted to and did intervene and, except as hereinafter stated, supports the position taken by relators.

At the time the condemnation suit was filed, City of Ladue's Ordinance No. 282, enacted in 1948 pursuant to the provisions of Chapter 89, RSMo 1949, V.A.M.S., authorizing city zoning and planning, was and is now in effect. (All statutory references herein are to RSMo 1949, V.A.M.S., unless otherwise stated.) Among other provisions, said ordinance prohibits, by means of restrictive provisions, the erection of any schoolhouse upon the land here involved.

Relators contend that the ordinance deprives the school district of the power to condemn said land. Respondent contends that §§ 165.370 and 165.100 of the statutes expressly enjoin upon the school district, exclusively, the duty and power of selecting and locating the site for the school in question and that the foregoing provisions of said ordinance are wholly ineffective insofar as they may otherwise provide. Thus, do the parties hereto agree that the essential issue is whether the City of Ladue, by the enactment of said ordinance pursuant to the authority vested in it by Chapter 89, has the power to immunize private property within its boundaries from the express power vested by the Legislature in the school district to select, locate, take by eminent domain and use private property for a public school upon payment of just compensation.

The petition alleges in elaborate detail that many school and accessory buildings and other structures, such as stadiums, athletic fields and the like, will be incident to the taking and use of the tract for school purposes, which will bring many children and other persons, in many vehicles, to many scholastic, recreational and social gatherings, both day and night, producing great noise, confusion, traffic problems and other hazards; that the area in which the tract is located "abounds with beautiful and quiet residential estates of the highest character in said County; that to permit school uses of said tract will disturb the peace and tranquility of said neighborhood, destroy and unstabilize land values therein; [and] that Relators have no adequate remedy at law except by this Court's writ of prohibition against the threatened taking and invasion; * * *."

The zoning ordinance established a comprehensive zoning plan for the city. It regulates and restricts the height, number of stories and size of buildings and other structures, the percentage of a lot that may be occupied, the size of yards and other open spaces, the density of population, the location, erection, construction, reconstruction,

alteration, and use of buildings, structures, and land for industry, trade, residence, or other purposes, all for the purpose of promoting the health, safety, morals, or general welfare of the city. Pursuant to its provisions, the city is divided into five residential districts (A, B, C, D, and E), one commercial district (F) and one industrial district (G). Lone Tree Farm is in B district which, with districts A and C, forbid the erection or use, unless as otherwise authorized in said ordinance, of any building or land except for (1) one family dwellings, (2) public parks, (3) truck gardening and (4) accessory buildings. (Since the institution of this action, C district, by ordinance, has been made available for public school sites. However, the view we take of the case makes that fact immaterial.)

Section 8 of said ordinance provides for granting special permits by the city council to make an otherwise unlawful use of the land in the various districts established by other sections of said ordinance. The petition alleges, however, that no such permit had been issued to the school district or anyone else, but that, in any event, such provision would not be available to the school district because it was unconstitutional in respects unnecessary to set forth in this opinion. The City of Ladue expressly refrains from urging invalidity of the special permit provisions of Section 8. Respondent, however, disclaims any reliance upon the provisions of that section and, for reasons hereinafter more fully stated, insists that the right of the school district to *select, locate and acquire by condemnation* the site in question is not and cannot be limited by or in any wise made dependent upon Section 8. Consequently, we also refrain from discussion of said section.

Article IX, § 1(a), of the Constitution of Missouri, V.A.M.S. provides: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools * * *."

Chapter 165 sets forth the statutes implementing the above quoted constitutional mandate. Section 165.100 provides that *"Whenever * * * the board of education in [a] city * * * school district * * * shall locate * * * sites for schoolhouses * * *,* and cannot agree with the owner thereof as to the price to be paid for the same, or for any other cause cannot secure a title thereto, the * * * board of education * * * may proceed to condemn the same in the same manner as provided for condemnation of right of way in sections 523.010 to 523.100, * * * and upon such condemnation and the payment of the appraisement, * * * the title * * * shall vest in the * * * board * * * in trust for the district and the purposes for which the same was so selected and located."* [Emphasis ours.]

Section 165.370 provides: "When the demands of the district require more than one public school building therein, the board shall, as soon as sufficient funds have been provided therefor, establish an adequate number of primary or ward schools, corresponding in grade to those of other public school districts, and for this purpose the board shall divide the school district into school wards and fix the boundaries thereof, and the board shall select and procure a site in each newly formed ward and erect a suitable school building thereon and furnish the same; and the board may also establish schools of a higher grade, * *."

The power of eminent domain is inherent in sovereignty and exists in a sovereign state without necessity of mention, Board of Regents for Northeast Missouri State Teachers College v. Palmer, 356 Mo. 946, 204 S.W.2d 291, 293, and is superior to property rights, 29 C.J.S. Eminent Domain § 2, p. 777, et seq. The right to exercise the power is exclusively a legislative prerogative, subject only to such limitations as are fixed by the constitution itself. State ex rel. State Highway Commission v. James, 356 Mo. 1161, 205 S.W.2d 534, 535. The only constitutional limitation placed upon the power of the Legisla-

ture to take private property for public schools is that provided by Article I, § 26, that "private property shall not be taken or damaged for public use without just compensation."

It is, therefore, too clear to admit of argument that the school district is vested by express grant from the Legislature with the absolute and exclusive power to select, locate and procure by condemnation the site here in question, unless the Legislature, by the enactment of Chapter 89, has invested the city with the police power of the state to restrict the selection and location of school sites to the extent herein asserted by relators.

· Admittedly, there is no case in Missouri that rules the precise question here presented. Relators cite the case of Kansas City v. School District of Kansas City, 356 Mo. 364, 201 S.W.2d 930, 933, as being persuasive of the validity of their contention. In that case, this court upheld the right of the city to collect fees from the school district for inspection of its boilers, smokestacks, and similar facilities, pursuant to ordinances enacted under the police power vested in the city. In so holding, however, the writer of the opinion carefully noted that "Section 10693 [R.S. 1939, now § 165.530] gives School District's board the full power to acquire sites for and to construct and repair necessary schoolhouses". Thereupon, the opinion states, 201 S.W.2d loc. cit. 933-934: "No constitutional or statutory restriction of City's police power as to its application to the regulation of the facilities of public school buildings has been observed by us; and, as we have seen, the State in the exercise of its own powers could have acted or could have expressly enjoined upon or delegated to School District's board the full responsibility of taking particular measures, in connection with School District's school buildings, otherwise within the scope of City's police power. Board of Education of City of St. Louis v. St. Louis [267 Mo. 356, 184 S.W. 975], supra. Since the State itself has taken no precautionary

measures, and City has been vested with the regulatory and supervisory responsibilities of the exercise of the police power, and School District (having no police power) has not been expressly and specifically given full duty to attend to these responsibilities, we think the Legislature is content in the thought the measures to be taken are within the police power vested in City." Thus, it is seen that, by express statement, the case deals only with the city's power of *regulation of the facilities* of public school buildings, and not with the *selection or location* of school sites. A careful study of the opinion in its entirety does not sustain relators' contention.

Relators also cite the case of Smith v. Board of Education of City of St. Louis, 359 Mo. 264, 221 S.W.2d 203, wherein it was held that an ordinance regulating sanitary conditions of restaurants in the City of St. Louis constituted a valid police regulation and was applicable to restaurants located in the public schools and operated by the board of education. In so ruling, the court said, 221 S.W.2d loc. cit. 205: "The operation of restaurants under Ordinance 43518, supra, includes a great deal more than the mere sanitary conditions of the buildings. As we have already pointed out, this ordinance includes the inspection of food sold, the method of cleaning cooking and eating utensils, the disposal of wastes and garbage, the method of dress for the restaurant employes, whether such employes are affected with any disease in a communicable form, and other regulations. Since the respondents [Board of Education et al.] have 'not been expressly and specifically given full duty to attend to these responsibilities, we think the Legislature is content in the thought the measures to be taken are within the police power vested in City.' [Citing Kansas City v. School District, supra.]" Again it is to be noted that the exercise of the police power authorized by the ordinance there under investigation is far wide of the power to *select, locate and procure school buildings*. The case does not aid relators.

Relators also cite Pasadena School District v. City of Pasadena, 166 Cal. 7, 134 P. 985, 47 L.R.A.,N.S., 892. In that case it was held that the powers conferred by state law upon the trustees of school districts to control school property and to erect and construct school buildings did not confer upon them such police powers as to exempt them from city ordinances regulating the manner and type of construction of buildings situate in various areas of the city. In so holding, the court stated, 134 P. 985, 986–987: "The state undoubtedly might provide, in the exercise of its police power and under a general law, for a complete system of regulation for the protection of the public health, safety, and comfort in the erection of school buildings. But this it has not done. It was not intended by the Legislature in empowering the trustees of school districts to control school property and erect schoolhouses that the matter of regulations respecting school buildings should be left to the trustees; * * *." As we read the opinion, it states, in effect, that the Legislature could provide by general law for a system of regulation which would preclude the city from encroaching thereon, but that the Legislature intentionally had not done so. That case is not authority for relators' assertion that Ordinance No. 282, enacted pursuant to the provisions of Chapter 89, takes from school districts the power conferred upon them by Sections 165.100 and 165.370 to select, locate and procure sites for school buildings.

Chapter 89, § 89.020, provides that, for the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of the city is empowered, among other things, to "regulate and restrict * * * the location and use of buildings, structures and land for trade, industry, residence or other purposes". Clearly, it contains no express grant of power to cities to regulate or restrict the location of *schools or other public buildings,* and relators cite no authority that such power is implicit in such a statute. On the other hand, respondent argues with much plausibility that the authority given the city to regulate and restrict the location and use of buildings and lands for "trade, industry, residence or *other purposes*", under the rule of ejusdem generis, negates implied authority to control the location of *schools or other public buildings,* because "trade", "industry" and "residence" relate to private property only and the phrase "other purposes" is not to be broadened to include a public use of property by the state in carrying out its constitutional mandate to establish and maintain free public schools. See State ex inf. McKittrick v. Wilson, 350 Mo. 486, 166 S.W.2d 499, 501, 143 A.L.R. 1465, for a discussion of the proper construction of the phrase "or otherwise" when preceded by an enumeration of specific things.

The case of State ex rel. Helsel v. Board of County Commissioners of Cuyahoga County, Ohio Com.Pl.1947, 79 N.E.2d 698, reveals the wisdom of applying the rule of ejusdem generis in the instant case. In that case the question was whether the provisions of zoning ordinances of two villages restricting certain areas to use for residential property would prohibit Cuyahoga County from lawfully voting bonds to pay for an airport site within such areas and which it had acquired by condemnation, and from operating such an airport. The court, after declaring that Ohio in the exercise of its sovereign prerogatives had assumed control over aviation said that the issue was to be resolved by determining whether municipal zoning restrictions were effective to prevent a county from using property for the public purpose for which it had been taken. The court further said, 79 N.E.2d loc. cit. 704: "To suppose that zoning ordinances may limit or prevent the public use for which land is taken is to invest municipalities with power to restrict the exercise of the power of eminent domain." And further, 79 N.E.2d loc. cit. 705: "Zoning ordinances are upheld on the theory that they bear a real and substantial relation to the public welfare. Their

validity rests upon the principle that the exercise of rights incident to the ownership of private property may be restricted in the interest of the general welfare of the inhabitants of the municipality. Through the medium of zoning ordinances municipalities may insist that private rights in real property yield to the general good of the community, but the presumption is that the use of public property for public purposes is designed to promote the general welfare also, and no case or textual authority has been cited, that supports the view that municipalities by zoning ordinances, may restrict or limit the use of *public property* for *public purposes.*" [Emphasis that court's.]

Relators cite no authority contrary to the conclusion reached by the Ohio court. In their reply brief, they insist, however, as did the city in its original "suggestions", that reference in Chapter 89 to "schools" amounts to "an express grant" of power to the city to prohibit the location of the school in question in district B, and that "there is no occasion for inference or implication regarding such power." Let us see.

The only reference to schools in the whole of Chapter 89 is that in § 89.040, which states that the regulations therein authorized "shall be made in accordance with a comprehensive plan and designed * * * *to facilitate the adequate provision of* transportation, water, sewerage, *schools,* parks and other public requirements." [Emphasis ours.] The meaning of the reference to schools is not readily clear and we have not found nor have we been cited any authority tending to clarify the meaning of the phrase. But, "to facilitate the adequate provision of * * * schools" definitely cannot be reasonably construed to vest the city with power to regulate, restrict or prohibit them.

Furthermore, if, by any process of reasoning, Chapter 89 should be tormented into meaning what relators contend it does, then a substantial portion of Section 165.370

would ipso facto be nullified. That section, among other things, provides that when the demands of the school district require more than one public school, the board shall divide it into school wards, fix the boundaries thereof, and *select and procure a site* in each new ward. Obviously, if the nine cities within the school district had the power to restrict the location of schools, it would become a practical impossibility for the school district to establish school wards and locate schools therein.

Respondent has cited numerous cases from other jurisdictions in support of the school district's contention to the effect that, in the absence of an express grant of power to so ordain, municipal zoning ordinances cannot encroach upon or limit the absolute right of the state or its lawfully designated subdivisions or agencies to select, locate and acquire land and buildings for public use, such as schools, state office buildings, hospitals, parks, highways, airports, etc. Relators have cited no case to the contrary, and we have found none. Space forbids discussion of the several cases cited by respondent. A discussion of one that is especially in point, followed by citation of the others, must suffice.

In New York, the statutes Sections 175 and 177, Village Law, c. 64, 63 McKinney Laws Annotated, are, in substance, identical to our Sections 89.020 and 89.040. So, too, do the laws of New York, Sections 401, 404, 1604 and 1709, Education Law, c. 16, McKinney Laws Annotated, Part 1, invest the school districts of New York with the same powers as do our Sections 165.370 and 165.100 invest school districts of Missouri.

In the case of Union Free School District No. 14 of Town of Hempstead, Nassau County v. Village of Hewlett Bay Park, 1950, 198 Misc. 932, 102 N.Y.S.2d 81, affirmed 278 App.Div. 706, 103 N.Y.S.2d 831, and 279 App.Div. 618, 107 N.Y.S.2d 858, the defendant village in 1949, by an amendment to its ordinances, excluded the erection of any schools within the borders of the village. In 1950, the voters of the plaintiff

school district authorized plaintiff to acquire certain premises within the village as a school site and to commence the action to have the ordinance declared invalid. In the first decision, supra, 102 N.Y.S.2d loc. cit. 83, the court said: "As the plaintiff is an official body to whom the education of the youth of the district has been entrusted by the state by special statute, I do not believe that the defendant Village, whose territory is within the school district, may by the exercise of zoning powers conferred upon it by Section 175 [the same as our § 89.020] of the Village Law, defeat or obstruct the plaintiff in the performance of its state function. 'The authority of a municipality to abrogate state law is never implied or inferred. It is only derived from express grant, never from a general grant of power. A state policy may not be ignored by a municipality unless it is specifically empowered so to do in terms clear and explicit.' Jewish Consumptives' Relief Soc. v. Town of Woodbury, 230 App.Div. 228, 234, 243 N.Y.S. 686, 692." The Supreme Court, Appellate Division, 107 N.Y.S.2d 858, loc. cit. 860, unanimously affirmed the trial court and further said: "The Village Law empowers villages to adopt zoning ordinances for 'the purpose of promoting the health, safety, morals, or the general welfare of the community' § 175. Any regulations adopted must be designed to facilitate 'the adequate provision of * * * schools' § 177 [the identical provision of our § 89.-040]. The Constitution of the State imposes the duty upon the Legislature to provide a system of free public education, and reserves to the Legislature full power in relation to the 'maintenance, support or administration' of the system, notwithstanding the powers conferred by the Home Rule provisions of the Constitution. [Cases cited.] In compliance with the direction of the Constitution, the Education Law has been enacted, and it imposes upon school districts or the boards of education therein the duty to locate schools and empowers them to secure sites by condemnation, if

necessary (Education Law, §§ 404, 405). * * * In the absence of a specific grant of power, the defendant village cannot by a zoning regulation prevent the location of a school within its borders and thereby prohibit the performance by the school district of the duty imposed upon it by law. [Cases cited.]" See: State ex rel. Helsel v. Board of County Commissioners, Ohio Com.Pl.1947, 79 N.E.2d 698; Great Neck Community School v. Dick, Sup.1955, 140 N.Y.S.2d 221, 222; Aviation Services, Inc. v. Board of Adjustment of Township of Hanover, 1956, 20 N.J. 275, 119 A.2d 761; Town of Bloomfield v. New Jersey Highway Authority, 1955, 18 N.J. 237, 113 A.2d 658, 662 et seq.; Decatur Park Dist. v. Becker, 1938, 368 Ill. 442, 14 N.E.2d 490, 493; State ex rel. Ohio Turnpike Commission v. Allen, 1952, 158 Ohio St. 168, 107 N.E.2d 345, 350; City of Charleston v. Southeastern Const. Co., 1950, 134 W.Va. 666, 64 S.W.2d 676, 682; Duquesne Light Co. v. Upper St. Clair Tp., 1954, 377 Pa. 323, 105 A.2d 287, 292; Gulf, C. & S. F. Ry. Co. v. White, Tex. Civ.App.1955, 281 S.W.2d 441, 449; Bassett on "Zoning" (1940), pp. 70, 196.

The only instances coming to our attention wherein the courts have permitted a municipality to control the location of a public institution through zoning ordinances are cases where the court found that the public agency in conducting such enterprise would be engaged in a proprietary rather than a governmental function. See Taber v. City of Benton Harbor, 280 Mich. 522, 274 N.W. 324; O'Brien v. Town of Greenburgh, 239 App.Div. 555, 268 N.Y.S. 173; Baltis v. Village of Westchester, 3 Ill. 2d 388, 121 N.E.2d 495; Jefferson County v. City of Birmingham, 256 Ala. 436, 55 So.2d 196; cf. McKinney v. City of High Point, 237 N.C. 66, 74 S.E.2d 440. However, these cases have no application here. The selection, location, procurement of a site through condemnation and operation of a public school is a governmental and not a proprietary function.

■ We are convinced that our statutes, Sections 165.100 and 165.370, enacted pur-

suant to the constitutional mandate set forth in Article IX, § 1(a), vest exclusively in the school districts of this state the power to select, locate and procure by condemnation, if necessary, sites for public schools, and that City of Ladue Ordinance No. 282 does not and, until there is an express grant from the state so to do, the city cannot lawfully restrict those powers.

The provisional rule in prohibition herein issued is discharged.

All concur.