Richard H. APPELBAUM, William Hamilton, Edward Jones, Elsie Kuhn, John J. Moody, Harry Noe, and Joseph Walter, Individually, and also as representative of and for all of the citizens, residents, property owners, and taxpayers of the Village of St. John, Missouri, and Continental Can Company, a corporation, Plaintiffs-Appellants,

v.

ST. LOUIS COUNTY, Defendant-Respondent,

the Village of Bel-Ridge, Defendant-Appellant.

No. 53602.

Supreme Court of Missouri, Division No. 1.

Feb. 9, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied March 9, 1970.

McMahon, Kieffer & Schmidt, David A. McMahon, Clayton, for appellants, Richard H. Applebaum and others.

Joseph B. Moore, St. Louis County Counselor, Thomas W. Wehrle, Deputy County Counselor, Andrew J. Minardi, Asst. County Counselor, Clayton, for respondent.

· Green & Lander, Edward Lander, Clayton, for appellant, Village of Bel-Ridge.

HIGGINS, Commissioner.

Action in equity by Richard H. Applebaum and others against St. Louis County and Village of Bel-Ridge, and cross petition by Bel-Ridge against the County, to enjoin construction by the County of an incinerator and land fill on land in the Villages of St. John and Bel-Ridge. Judgment was for defendant St. Louis County against plaintiffs on their petition and against Bel-Ridge on its cross petition.

In 1964 St. Louis County was the beneficiary of a study prepared by Horner & Shifrin, Consulting Engineers, financed by an interest-free loan from the Federal Housing and Home Finance Agency. The purpose of the study was to determine the most appropriate type, size, and location of facilities required to dispose of mixed refuse produced in St. Louis County, and it was directed specifically toward eventual construction of incineration facilities.

After completion of the study and at a special election June 22, 1965, the electorate of St. Louis County approved Proposition No. 3 authorizing the county to issue $5,-900,000 in bonds for planning, designing, acquiring, constructing, and equipping incinerators for the destruction of garbage, trash, cinders, refuse matter, and waste, and acquiring land therefor.

Pursuant to the authority of Proposition No. 3, and on November 16, 1965, the St. Louis County Council, by Ordinance No. 3744, authorized and directed its county supervisor to contract with Horner & Shifrin for engineering services necessary for the design and supervision of construction of the two solid refuse incinerators.

On February 11, 1966, St. Louis County Public Works Director D. E. Mueller requested the county's Board of Public Works to approve construction plans and selection of a construction site in North St. Louis County on the north side of St. Charles Rock Road in the villages of St. John and Bel-Ridge zoned by those municipalities partly residential and light industrial. The Board of Public Works approved Mr. Mueller's recommendations and, by letter of February 14, 1966, requested the St. Louis County Council to establish the proposed area as the site of one of the authorized incinerators.

The Council, on May 4, 1966, by Ordinance 3940, authorized and directed the Board of Public Works and county counselor to acquire, by negotiation, purchase, condemnation, or otherwise, the proposed site as legally described to be used for incinerator, land fill, and park purposes, deemed the establishment of an incinerator, land fill, and park on the proposed site beneficial and necessary to the health and welfare of all of St. Louis County, and authorized payment for such acquisitions from the Sanitary Land Fills Fund and the Incinerator Fund 1965 Bond Issue, Proposition No. 3.

The Council conducted a public hearing on the propositions of Ordinance No. 3940 in St. John, and interested parties were permitted to speak at regular meetings on final passage and perfection of Ordinance No. 3940.

Plaintiffs' petition and the cross petition of Bel-Ridge alleged: that Ordinance No. 3940 is an unreasonable, arbitrary and capricious act of the legislative body (the County Council) and, particularly, that it

violated the zoning ordinance and residential character of Bel-Ridge; that the proposed operation of an incinerator on the site would produce dirt, smoke, noise, and odor as to constitute a nuisance; and it was prayed that defendants be restrained and enjoined from constructing the proposed incinerator and land fill on the proposed site.

The answer of St. Louis County alleged: that it is a county of the first class operating under a charter adopted pursuant to Article VI, Section 18 of the Missouri Constitution, V.A.M.S.; that the petition and cross petition state no claim for relief; that the action is premature in that the incinerator has not been constructed; that the relief sought will not lie against a political subdivision; and that the relief sought is against the public policy of Missouri because Section 49.303, V.A.M.S., authorizes St. Louis County, when found necessary for protection of public health, to construct and operate an incinerator.

The issues raised by the pleadings were tried to the court in six days of trial during which nearly 900 pages of testimony were adduced and many exhibits were received in evidence. In finding for St. Louis County, the court's Decree, Findings of Facts, Review of Testimony, Conclusions of Law, and Conclusions of the Court, were of such detail as to cover 56 transcript pages and, upon this review, those findings and the judgment of the trial court are not to be disturbed unless clearly erroneous. Civil Rule 73.01(d), V.A.M.R. It would serve no useful purpose to detail all the evidence and findings, and only the attacked findings and the evidence necessary to disposition of the points of this appeal will be recited.

The Solid Waste Disposal Study prepared for St. Louis County describes "refuse incineration": [It] "consists of the controlled burning of mixed refuse so as to provide a sanitary and inoffensive residue. Well controlled burning results in an essentially nuisance-free operation, in that odors, smoke and fly ash constitute no significant problems. The incinerator residue, which may be 5 to 25 per cent by weight of the raw refuse, occupies only a small percentage (3 to 15 per cent) of the volume of the raw refuse, and may be dumped as fill material without subsequent earth cover.

"Incinerators often are constructed in built-up areas, and in some cases, adjacent to residential developments. It is preferable, however, to locate such facilities in areas that are zoned for industry. The most ideal incinerator site would be near the center of refuse production, and would be adjacent to an area suitable for receiving the residue as fill. * * *

"Without considering the area necessary for residue disposal, the minimum area required for a 500 to 600 ton per day incinerator would be on the order of 5 to 6 acres. It normally is desirable to provide some additional area for planting and landscaping.

"It is necessary that the method or methods of refuse disposal to be adopted provide a maximum degree of reliability in order to prevent an excessive accumulation of raw refuse. * * * The greatest degree of reliability will be achieved by providing flexibility in the disposal system. In incineration, flexibility is assured by providing adequate refuse receiving capacity, multiple burning units, whether in one or in several plants, and equipment requiring a minimum amount of maintenance.

" * * * The residue discharged from incinerator grates is a mixture of ashes, tin cans, noncombustibles and unburned refuse. The residue must be quenched thoroughly to eliminate fire, smoke and odors, before being conveyed or hauled to a disposal site. * * *

"The quantity of residue may be as low as 5 per cent or as high as 25 per cent by weight of the raw refuse. For St. Louis County refuse, the proportion of residue is expected to be toward the lower limit of this range. * * * Since the residue

would be thoroughly quenched and would contain little if any organic materials, it could be dumped into abandoned quarries or similar places without subsequent earth cover. * * *

" * * * it is recommended that incinerators built by St. Louis County be of the continuous feed type. All refuse would be weighed by truck scales prior to dumping into the receiving bin. The receiving bin and the tipping floor would be enclosed. * * * From the receiving bin, the refuse would be conveyed by overhead cranes equipped with clamshell type buckets to the water-cooled feed hoppers of the incinerator furnaces. The furnaces would be equipped with either bar and key, rocking, or reciprocating type grates, designed to move the refuse continuously from the feed hopper to the discharge end. Essentially complete combustion of the burnable refuse would be effected. The residue from the grates would be discharged to a water-filled conveyor trough, which would serve as a means of quenching the residue as well as a means of conveying the residue to trucks for hauling to disposal sites. The furnaces, together with their combustion and subsidence chambers, would be designed to effect the removal of particulate matter from the gas stream in accordance with the applicable air pollution ordinances. Provisions would be made for the future installation of mechanical fly ash removal equipment if required. Natural draft chimneys would be provided, which would be designed to serve as stacks for induced draft fans, if such fans were to be required at a later date for a more refined fly ash removal system."

The study also makes several comparisons between the characteristics of conventional "sanitary land fill" and the type land fill operation which accompanies incineration. "A well-operated sanitary landfill generally is considered to comply with normal public health requirements. It is difficult, however, to avoid conditions under which public health hazards may be created, and constant attention must be given to the

control and elimination of rodents and insects, and to the prevention of water and air pollution. The decomposition of organic matter in sanitary landfills produces flammable gases, which have been known to ignite and cause damage to adjacent properties.

"Materials fed to incinerators normally are subjected to temperatures in the range of 1,500 to 2,000 degrees Fahrenheit, and very little combustible material remains unburned. The residue, for the most part a sterile ash, may be used as fill material with no particular nuisance or hazard to public health.

" * * * An operating (sanitary) landfill is faced with the problem of combating adverse public reaction to appearance, odor, traffic, dust and blowing paper, and occasional smoke created by the burning of logs and timbers that cannot practically be deposited in landfills. Modern incinerators often are located near or even adjacent to residential areas, although they usually are located in industrial zones. They normally incorporate features designed to eliminate dust, odor, and fly ash nuisances. * * *

" * * * Without exception, the existing sanitary landfills have been subjected to criticism regularly. * * * It appears, therefore, that the County must respond to the prevailing public opinion, and seek methods of refuse disposal other than sanitary landfill."

F. E. Wisely of Horner & Shifrin was the principal in preparation of the Solid Waste Study. He felt that one of the suggested incinerators should be built in North St. Louis County between Page Boulevard and St. Charles Rock Road. He described in detail the design, operation and appearance of the incinerator and residue in question, and stated it would meet the criteria of the Solid Waste Study, conform to all existing pollution and health standards, and stack height would be within Federal Aviation Authority limits. Rodent and insect controls would be built into the facility, as well as controls for dirt, dust, and fly

ash. Dumping and incineration would be an entirely enclosed operation. The plant would be located on the site approximately a thousand feet from residential property. Noise would be minor. He felt the site in question best met criteria for location of an incinerator.

Charles K. Gillespie, an industrial furnace designer, had visited incinerator operations which had rat and insect problems, odors, and noise, but acknowledged current rapidly changing technology with respect to incinerator operation to the extent that residue from a properly designed and operated incinerator could be used for roadbed and as cover for conventional sanitary land fills.

Joseph W. Ruzika of Nichols Engineering and Research Corporation of New York examined the plans of the proposed incinerator and found them to meet the criteria of well-designed fly ash elimination systems. His company had constructed similar incinerators in residential areas.

D. E. Mueller, St. Louis County Director of Public Works, stated that several sites for the incinerator and accompanying residue disposal area were considered and that the site in question best met the criteria of the Solid Waste Disposal Study. The site is an unimproved rectangular tract approximately 3,000 feet north and south by 1,000 to 1,600 feet east and west, containing approximately 80 acres on the north side of St. Charles Rock Road, east of Endicott Avenue, and south of Ramona Avenue. Access would be from St. Charles Rock Road, a major street in St. Louis County. The incinerator would be constructed on approximately eight acres in the south center portion of the tract, and the remaining acreage would be filled with the ash residue from the incinerator to a predetermined elevation and topped with two feet of soil, after which the area would be used as a park joined to existing Endicott County Park lying to the northwest of the tract. The present topography of the fill site north of the proposed incinerator site is scrub growth, the center portion is an abandoned clay mine, and the tract is rough with deep pits and gullies.

Evidence indicates that part of the tract in question is in St. John zoned residential and that part of it is in Bel-Ridge zoned light industrial. According to Herman F. Wagner, Planning Director for St. Louis County, use of the tract for an incinerator and residue disposal would not be contrary to good planning policies.

Suffice to say that plaintiffs adduced evidence calculated to show that use of the property as intended by St. Louis County would create conditions detrimental to aesthetic considerations and property values.

Although appellants Appelbaum, et al., and appellant Bel-Ridge have filed separate briefs, their points, arguments, and authorities are similar to the extent that they may be discussed together. Appellants contend the court erred in its conclusions of law, judgment and decree: I. That St. Louis County has authority to locate an incinerator and land fill in an incorporated area and is exempt from the zoning ordinances of Bel-Ridge and St. John; II. That operation of the incinerator and land fill would not violate zoning ordinances of Bel-Ridge and St. John; III. That operation of the incinerator and land fill would not create a nuisance; and IV. That passage of Ordinance No. 3940 was not arbitrary, capricious, and invalid.

█ The questions raised by Points I and II are whether the County has authority to make the proposed use of the tract in question, and whether that use is subject to the zoning powers of St. John and Bel-Ridge conferred by Section 89.020, V.A.M.S.

The authority for St. Louis County to acquire land upon which to construct an incinerator and to construct an incinerator is clear. Article VI, Sections 18–20, Missouri Constitution, authorizes special charters for the government of certain counties,

and Section 18(c) authorizes such charter to provide, among other things, for the vesting and exercise of legislative power pertaining to public health, and the terms upon which the county shall perform any of the services and functions of any municipality or other political subdivision except school districts. Pursuant to such constitutional authority, St. Louis County, otherwise a first class county, has adopted a Home Rule Charter, Article III, Section 22(20) of which provides for the exercise of public health legislative power, and Section 22(19) of which provides that the Council shall have power to provide terms upon which the county shall perform any service of a municipality or political subdivision except a school district. Readey v. St. Louis County Water Co., Mo., 352 S.W.2d 622, 624[1]. Section 49.303, V.A.M.S., provides that when the county council of a first class county, having a constitutional charter, finds it necessary for the protection of public health to construct and operate incinerators for the destruction of garbage, trash, cinders, refuse matter and waste, the county is authorized to acquire land by eminent domain to construct and operate incinerators, to provide facilities for the deposit of material after collection, and to transfer or transport it to a land fill. Section 64.320, V.A.M.S., provides that first class counties may acquire lands by eminent domain upon which to operate sanitary land fills and parks.

■ The County Council has acted pursuant to these authorities, and its power with respect to enactment of ordinances which tend to enhance public health is not limited to the power conferred by Article VI, Section 18(c) of the Missouri Constitution and Article III, Section 22(20) of the Charter. St. Louis County may also exercise power pertaining to public health conferred by the state upon counties of the first class, all of which authorize enactment of ordinances tending to enhance the health of all residents of St. Louis County irrespective of whether they also reside within a municipality. Readey v. St. Louis

County Water Co., supra, 352 S.W.2d l. c. 624–625[1].

■ Is the exercise of such authority by St. Louis County subject to zoning ordinances enacted by St. John and Bel-Ridge? In this respect it is noted that neither the statutes, Sections 49.303 and 64.320, supra, restricts the county in the exercise of these public health powers from acquiring land for construction of an incinerator and accompanying land fill to unincorporated areas. The power conferred upon St. Louis County to legislate in incorporated as well as unincorporated areas has already been established where the exercise of such power applies "county-wide," as in matters of public health. Readey v. St. Louis County Water Co., supra. The situation is analogous to that in State ex rel. St. Louis Union Trust Co. v. Ferriss, Mo., 304 S.W. 2d 896, where the City of Ladue attempted through its zoning power to prohibit the Ladue school district from acquiring land and constructing school facilities on land in Ladue. The court held that where the constitution and statutes vested the power to locate and construct a school, the city had no power to prohibit the exercise of such power by zoning ordinance. The court quoted State ex rel. Helsel v. Board of County Commissioners, Ohio, 79 N.E.2d 698, 704, which held that zoning ordinances of two municipalities could not prevent a county from acquiring and using property within such areas for a public airport: "To suppose that zoning ordinances may limit or prevent the public use for which land is taken is to invest municipalities with power to restrict the exercise of the power of eminent domain." The court further clarified the limitation on municipal zoning powers where public uses are involved, stating that " ' * * * § 89.020, provides that, for the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of the city is empowered, among other things, to "regulate and restrict * * * the location and use of buildings, structures and land for trade, industry, residence or other pur-

poses". Clearly, it contains no express grant of power to cities to regulate or restrict the location of *schools or other public buildings * * * ' "*. 304 S.W.2d l. c. 900. Similarly, Section 89.020, supra, contains no express grant of power to either Bel-Ridge or St. John to restrict the power given St. Louis County to select sites for incinerators and land fills and procure them by eminent domain if necessary for the enhancement of public health in all of St. Louis County.

Appellants cite St. Louis County v. City of Manchester, Mo., 360 S.W.2d 638, on their contention that St. Louis County can be restricted by zoning ordinance of a municipality. It does not support that proposition because its facts are distinguishable. Manchester wished to construct a sewage disposal plant outside its own limits and the court held that even though it had the authority to do so it could not violate zoning laws applicable to unincorporated areas enacted and administered by the County Council. By contrast, it has been demonstrated that St. Louis County has specific constitutional authority with respect to its proposed incinerator and the appellant municipalities do not possess any grant of power under which to restrict the County even upon land within those municipalities. State ex rel. Askew v. Kopp, Mo., 330 S.W.2d 882, is also distinguishable because the county involved was Jackson County which does not operate under a special charter pursuant to Article VI, Section 18(c), Missouri Constitution, and there was no controversy between the municipality, Raytown, and the county.

Since St. Louis County is not subject to the zoning ordinances of the appellant municipalities in the location and construction of its incinerator and residue fill, it is also not in violation of any such ordinances.

Appellants argue that since Section 64.-320, supra, and Ordinance No. 3440 both speak of "sanitary landfill," the county cannot use such authority and process to construct and operate an "ash fill" or "residue fill" as the evidence indicates the case to be. Appellants cite no authority suggesting that "sanitary landfills," "ash fills," and "residue fills" are not *ejusdem generis,* and the evidence from appellants' witness Gillespie is that whether the residue is hauled from the incinerator site for disposal or disposed of in the adjoining area, "both of them are landfilling."

Appellants' Point III is that the court erred in failing to find that the proposed incinerator and fill would create a nuisance. Appellants cite Sommers v. City of Detroit, 284 Mich. 67, 278 N.W. 767, where an injunction against a proposed incinerator was denied, and Northwest Home Owners Ass'n v. City of Detroit, 298 Mich. 622, 299 N.W. 740, where an injunction was subsequently granted against actual operation of the same incinerator. From these cases it is argued that this proposed incinerator should be enjoined now before it is even constructed rather than to wait until the expenditure of public funds has been made.

There are several factors which call for a rejection of this argument in this case. As indicated, the facility has not yet been built and the evidence indicates it will be a nuisance-free operation. Evidence that other incinerators have produced nuisance conditions simply raised an issue for the trial court to resolve, and deference is paid to that court in its resolution of the issue where the evidence supports that judgment as previously demonstrated. The evidence also shows that advancement has been made in recent years in the technology surrounding incinerators, and the two Michigan cases go back to 1938 and 1941. The evidence also distinguishes this case from Barth v. Christian Psychopathic Hospital Ass'n, 196 Mich. 642, 163 N.W. 62, 63, which enjoined proposed construction of a lunatic asylum in a residential area where the hospital association's own evidence showed such would constitute a nuisance.

Under the evidence in this case the court correctly denied an injunction against anticipated nuisance because "mere apprehension of future injury or damage cannot be the basis for the issuance of the writ." Fenestra Incorporated v. Gulf American Land Corp., 377 Mich. 565, 141 N.W.2d 36, 52[14]. In Kelly v. City of Philadelphia, 382 Pa. 459, 115 A.2d 238, the appellate court affirmed an injunction against construction of a public incinerator near a residential area on the ground that the ordinance upon which its proposed construction was predicated was invalid, but reversed the decision insofar as it was predicated upon findings of nuisance. The holding in this latter respect is in point to this case: " 'Where it is sought to enjoin an anticipated nuisance, it must be shown (a) that the proposed construction or the use to be made of the property will be a nuisance per se; (b) or that, while it may not amount to a nuisance per se, under the circumstances of the case a nuisance *must necessarily result* from the contemplated act or thing. * * * The injury must be actually threatened, not merely anticipated; it must be *practically certain,* not merely probable." * * * The evidence in the present case was conflicting throughout. The testimony of the lay and expert witnesses on behalf of the plaintiffs was to the effect that the operation of the incinerator would create conditions constituting an enjoinable nuisance. On the other hand, the lay and expert testimony adduced by the City, of *at least* equal quality and persuasiveness, was directly to the contrary. Under this state of the evidence, it could not be held that a nuisance would necessarily result from the operation of the incinerator." 115 A.2d l. c. 241[1, 2].

▮ Finally, appellants' contention is that the court should have held that passage of Ordinance No. 3940 was arbitrary, capricious, and unreasonable. Appellants argue that this is so because the powers that be did not consider whether rats would be present at the site, the availability of other sites; they did not honor the residential zoning present nor consider the economic factor of locating the facility near the interstate highway system; they ignored the protests of the council member from the proposed site's district, and failed to consider air pollution.

Ordinance No. 3940, enacted by the St. Louis County Council, is an ordinance of the legislative body of the County, and it is cloaked with a presumption of validity. Downing v. City of Joplin, Mo., 312 S.W. 81, 84[3]. Those challenging its validity have the burden of proving their charge, and unless it appears clearly arbitrary and unreasonable the court cannot substitute its opinion for that of the council or, if the question is reasonably doubtful or fairly debatable, the court cannot do so. Miller v. Kansas City, Mo.App., 358 S.W.2d 100, 104 [1, 2]; City of St. Louis v. United Rys. Co. of St. Louis, 263 Mo. 507, 174 S.W. 78, 94[13–15]; Desloge v. County of St. Louis, Mo., 431 S.W.2d 126, 131–132[3–6].

The evidence of this case does not show a clearly arbitrary enactment but, on the contrary, shows a valid ordinance validly enacted. It is not disputed that appellants, along with others, appeared at the public hearing held on the ordinance and expressed opposition to its purposes, and cannot now be heard to say that the council did not have their facts before it. One councilman considered other sites and proposed one such site to the Council, and it is not shown that these or other sites were not examined or considered by the Council. Rules were suspended at one council meeting on the ordinance to permit persons from St. John and Bel-Ridge to speak their opposition. Affirmatively, in support of the Council's action, is the detailed study prepared for the Council by Horner & Shifrin, which, as demonstrated, brought detailed criteria, considerations, and recommendations to the Council. The Public Works Director explained why other sites were inadequate. These items alone are sufficient to show a fairly debatable question resolved by the

Council which must be permitted to stand under the cited authorities.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and CARVER, Special Judge, concur.

STORCKMAN, J., not sitting.