**CITY OF ST. LOUIS, Respondent,**

v.

**CITY OF BRIDGETON, Appellant.**

No. 50323.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 17, 1985.

Motion for Rehearing and/or Transfer
Denied Feb. 13, 1986.

Application to Transfer Denied
March 27, 1986.

William A. Richter, Martin P. Zucker, St. Louis, for appellant.

Julian Bush, St. Louis, for respondent.

REINHARD, Judge.

The City of Bridgeton appeals from a judgment after a court trial declaring that the City of St. Louis is immune from the Bridgeton Zoning Ordinance in all activities related to its ownership and operation of Lambert-St. Louis International Airport and permanently enjoining Bridgeton from enforcing its zoning ordinance against the City of St. Louis. The trial court further held that Bridgeton's Zoning Ordinance is unconstitutional as applied to the property in question. We affirm.

The present dispute involves land owned by the City of St. Louis and located in an area of Bridgeton zoned R–4 (residential).

St. Louis proposes the construction of a 1400 space parking lot for airport employees on this property, a use not permitted in R–4 districts.[1] After the Bridgeton City Council unanimously rejected a proposed ordinance granting St. Louis permission to construct the lot under a section of the zoning ordinance applicable to off-street parking, St. Louis filed a two count petition for injunctive and declaratory relief. In Count I, St. Louis sought a declaration that Bridgeton's Zoning Ordinance has no application to the construction and operation of the proposed parking lot, while in Count II it sought a declaration that the R–4 classification of the property involved in this dispute was arbitrary and unreasonable. It requested in both counts that Bridgeton be enjoined from taking action to interfere with the proposed parking lot construction.

The trial produced a voluminous record; however, for purposes of this appeal the pertinent facts can be summarized succinctly. The City of St. Louis has owned and operated Lambert-St. Louis International Airport in northwest St. Louis County since the 1920's. Consisting of only 2,300 acres, Lambert is the second smallest major airport in the United States in terms of acreage, although it now ranks sixth in number of passengers served. The airport's space problems are complicated by its location in the midst of a highly urbanized region. Most of the airport lies in an unincorporated portion of St. Louis County, while parts of it fall within the boundaries of the Cities of Bridgeton, Bridgeton Terrace, Hazelwood, Berkeley, Woodson Terrace, Edmundson and St. Ann. During the late 1960's and early 1970's consideration was given to closing Lambert and opening a new airport on an 18,000 acre site in Illinois. This proposal was, in fact, endorsed by former Secretary of Transportation Coleman despite referenda indicating overwhelming citizen support for Lambert. Coleman's successor, Secretary Adams, reversed his decision and a period of planning

---

1. Bridgeton claims that the lot is only a "temporary one." However, testimony from the airport director at trial indicated that it will be used "into the foreseeable future."

and improvement for Lambert began in 1977.

Despite improvements in other areas, lack of parking space remains a serious problem at Lambert. Public parking was so scarce during the winter of 1984–85 that some cars were being "triple-parked" and other travelers could not be accommodated at all. After a new lot was added in March 1985, the crisis was somewhat alleviated, but public parking space remains inadequate. Employee parking areas are also over capacity; typically anywhere from 45 to 100 automobiles are parked in aisles or other unmarked locations. Furthermore, projections at trial showed that an additional 1,500 to 2,000 employee parking spaces will be needed within the next year.

The property upon which the City now proposes to build an employee parking lot consists of 18 acres of land which have been part of the airport since approximately 1960. The parcel is located just north of Interstate 70 and west of the intersection of Hunter Drive and Cypress Road; part of a neighborhood bounded by I–70 on the south, Lindbergh on the west, Natural Bridge on the north and Cypress on the east. Across Cypress to the east is the airport, and immediately to the north and west are industrial areas. All property that is contiguous to the parcel, with the exception of I–70, is owned by the City of St. Louis, in connection with the airport, or Hunter Engineering Corporation. Within the broader neighborhood described above are two areas containing single-family residences. These homes are being purchased by the airport at the request of the owners, and when that process is completed the area will no longer contain single-family residential housing. It is undisputed that because of airport noise and other environmental conditions the neighborhood is unsuitable for such residences.[2]

The northeast corner of the property lies within the "clear zone" of runway 6–24 as defined by federal regulations and the Federal Aviation Administration, an area extending from the primary surface of the runway which is generally protected from development. The proposed parking lot would not encroach upon the "clear zone," but would be constructed upon the rest of the parcel and lie within the "approach area", which extends past the "clear zone" boundary. Height restrictions applicable to "approach area" construction are contained in 14 C.F.R. § 77 and the FAA generally discourages "approach area" development, although limited construction is not uncommon, particularly at "landlocked" airports such as Lambert. At the present time, navigational lights, frangible from the ground up, are located in both the "approach area" and "clear zone" off runway 6–24. The proposed parking lot would not necessitate the removal of those lights. In addition, maps introduced at trial showed that several roads, including a portion of I–70, are present in the "clear zone" and "approach area".

Because of the proposed lot's location FAA approval was necessary, and St. Louis requested an "air space determination". Pursuant to that request the FAA reported that it had "determined from [its] aeronautical study that the Concept Plan for an Employee Parking Lot at Hunter and Cypress Road would not exceed Federal Aviation Administration (FAA) obstructions, would not be a hazard to air navigation and that obstruction marking lighting would not be necessary." Although it found no "objection", the FAA did express the opinion that the plan was "inconsistent with good planning practices". In addition, St. Louis secured the approval of the Metropolitan Sewer District and applied for approv-

**2.** Numerous lawsuits brought by homeowners near the airport, which allege that airport noise renders their property unusable for residential purposes, are pending. We also note that Professor Alfred Kahn, a land use and planning expert who testified for St. Louis at trial, said that the only conceivable use of the land which would be among those permitted in an R–4 district was horticultural. He further testified that "as a matter of land use policy, it would not be appropriate to devote this property to horticultural use" and characterized the R–4 classification as "an incredible piece of spot zoning."

al by the Missouri Highway Department, which is still reviewing the proposal.

The land at issue has been zoned R–4, denominated as a one-family dwelling district, since Bridgeton enacted its zoning ordinance in the early 1950's. The areas to the north and west are zoned M–1 (industrial), the area to the east M–3C (also industrial), the area to the southeast B–3 (commercial), and, across I–70 to the south, R–2 (residential). The property in question is the only airport property which falls within a district zoned residential by Bridgeton; in fact, it is the only "approach area" property located in any municipality or St. Louis County which is so zoned.

The origin of the present dispute can be traced to 1980, when the City of St. Louis requested that Bridgeton rezone the property to allow construction of a public parking lot. Hunter Engineering Company led opposition to this proposal, with Chairman of the Board Lee Hunter, whose office overlooks the property, testifying before the Planning and Zoning Commission that the land was "gorgeous" and that the airport was "trying to move in on Hunter Engineering". The Commission voted against approving the rezoning application, which was subsequently withdrawn. When the present proposal was developed in 1984 efforts were made to accommodate Mr. Hunter and solicit his support. Meetings between airport personnel and Bridgeton officials were also held. After incorporating several proposals for changes into the design of the lot, St. Louis submitted a request under § 11.3–5 of the Bridgeton Zoning Ordinance for permission to build the parking area. Authorization for non-residential parking areas in a residential district under that section can be given only by the City Council, and passage of an ordinance is required. The proposed ordinance granting authorization for the airport lot was not adopted and this suit followed.

On appeal Bridgeton alleges that the trial court erred in declaring that the City of St. Louis is immune from the Bridgeton Zoning Ordinance in all airport related activities because: 1) St. Louis is not a superior sovereign; 2) under § 305.200, RSMo 1978, land acquired for airport use is subject to the zoning of municipalities; and 3) a "balancing of interests" favors application of the Bridgeton Zoning Ordinance in this instance.

The issue of governmental immunity from zoning has been considered by the Missouri Supreme Court in four cases: *State ex rel. St. Louis Union Trust Co. v. Ferriss,* 304 S.W.2d 896 (Mo. banc 1957); *State ex rel. Askew v. Kopp,* 330 S.W.2d 882 (Mo.1960); *St. Louis County v. City of Manchester,* 360 S.W.2d 638 (Mo. banc 1962); and *Appelbaum v. St. Louis County,* 451 S.W.2d 107 (Mo.1970). *Ferriss* held that the City of Ladue could not restrict, through its zoning ordinance, the School Board's power to select, locate and take by eminent domain private property for a public school. In *Kopp* the Court decided that the City of Raytown was not subject to the zoning laws of Jackson County in locating a sewage disposal plant. However, *Kopp* was distinguished in *Manchester,* where the Court held that the City of Manchester *was* restricted in the selection of a sewage treatment plant by the zoning laws of St. Louis County, which, unlike Jackson County, operated under a constitutional charter. Finally, in *Appelbaum* the Court found that St. Louis County was not required to comply with the zoning ordinances of municipalities in locating an incinerator and land fill. A thorough discussion of these cases and the applicable law is contained in *City of Kirkwood v. City of Sunset Hills,* 589 S.W.2d 31 (Mo.App.1979), where this court held that Kirkwood did not have to comply with the zoning law of Sunset Hills in establishing a public swimming pool in that city. All of those cases are distinguishable from the one at bar. They did not involve the City of St. Louis, which is a unique entity under the Missouri Constitution. *See, Boyd-Richardson Co. v. Leachman,* 615 S.W.2d 46, 52–53 (Mo. banc 1981). Nor did they involve a use of land in connection with an existing airport. Furthermore, statutory provisions related to acquisition of land for parks, landfills and sew-

age treatment plants were implicated in those cases. However, principles of law have been developed which aid us in the determination of this controversy.

*City of Kirkwood* enumerates five basic tests that have been employed by various courts: 1) The "superior sovereign" test; 2) The "power of eminent domain" test; 3) The "governmental/proprietary" test; 4) The "statutory guidance" test; and 5) The "balancing of interests" test. 589 S.W.2d at 37. In addition, we observed in *Kirkwood* that the common thread running through Missouri cases was that the governmental entity with the superior source of power prevailed. 589 S.W.2d at 42.

■ Bridgeton contends that the trial court was wrong in holding that the City of St. Louis is a "superior sovereign". Bridgeton is a constitutional charter city under Mo. Const. Art. VI, § 19, while St. Louis is recognized as a charter city under Art. VI, § 31, and is *sui generis*. Both are therefore constitutionally recognized entities. However, St. Louis contends that its sovereignty is superior because Art. VI, § 19(a) limits Bridgeton, and other cities organized under that provision, to the exercise of "such powers [as] are consistent with the constitution of this state". But Art. VI, § 31 provides:

> ... As a City [St. Louis] shall continue for City purposes with its present Charter, *subject to changes and amendments provided by the constitution or by law and with the powers, organization, rights and priviliges permitted by this constitution or by law.* (emphasis ours).

Furthermore, § 32(b) provides that any new or revised St. Louis City charter "... shall be in harmony with the constitution and laws of the state ...". While St. Louis is indeed a unique political entity, it does not enjoy sovereignty superior to that of Bridgeton.

■ Bridgeton further asserts that its source of power is superior to that of St. Louis, since Bridgeton's zoning power is constitutionally based under Art. VI § 19(a), while St. Louis' authority to oper-ate and acquire land for the airport is derived from §§ 305.170–305.200, RSMo 1978. We cannot agree with Bridgeton's characterization of St. Louis' authority. St. Louis is empowered by its charter to operate the airport, *see Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045 (1928); *American Airlines, Inc. v. City of St. Louis*, 368 S.W.2d 161, 164 (Mo.1963), and the charter of the City of St. Louis is specifically recognized by the Missouri Constitution. Art. VI, § 31–33. Thus St. Louis' power to operate the airport is ultimately derived from the constitution.

■ Furthermore, § 305.200 does not make St. Louis subject to the Bridgeton Zoning Ordinance under the statutory guidance test. § 305.200.3 states in pertinent part that:

> ... no airport or landing field shall be established or located in any county, city or city under special charter in violation of any plan or master airport plan or zoning regulation restricting the location of an airport or landing field adopted by the planning commission of any such county, city or city under special charter.

This provision relates to the establishment of a new airport in a new location, not the operation of an existing one, and we find it inapplicable here. Bridgeton's reliance on § 305.575, RSMo 1978, known as the Missouri-St. Louis Metropolitan Airport Authority Act, is also misplaced. The zoning provisions of that act are clearly designed to allow the Airport Authority to prevent land uses which pose threats to navigation, and not to make the airport subject to control by surrounding municipalities in the use of its own land. Indeed, the Act, which was implemented during the Lambert/Waterloo controversy, is indicative of legislative support for the airport.

Having examined the question of immunity in light of the "superior sovereign", "superior source of power", and "statutory guidance" tests, we consider the application of "eminent domain" analysis. The traditional "eminent domain" test is set forth in *Ferriss:*

To suppose that zoning ordinances may limit or prevent the public use for which land is taken is to invest municipalities with power to restrict the exercise of the power of eminent domain.

\*   \*   \*   \*   \*   \*

Through the medium of zoning ordinances municipalities may insist that private rights in real property yield to the general good of the community, but the presumption is that the use of public property for public purposes is designed to promote the general welfare also, and no case or textual authority has been cited, that supports the view that municipalities by zoning ordinances, may restrict or limit the use of public property for public purposes.

304 S.W.2d at 900–901 (quoting *State ex rel. Helsel v. Board of County Commissioners of Cuyahoga County*, 79 N.E.2d 698, 704 (Ohio 1947)).

However, a careful examination of the Supreme Court's subsequent decision in *Manchester, supra,* reveals that the Court utilized what might be termed a "modified balancing of interests" approach.[3] The Court explicitly considered the public interest and the reasonableness of the actions taken by the entity asserting immunity. 360 S.W.2d at 642. While no Missouri Court has expressly adopted the "balancing of interests" test, our court in *City of Kirkwood* evinced an inclination to do so. It thus appears that Missouri case law is in congruence with the modern trend towards analyzing the public interests implicated in the particular land use dispute.[4]

One of the first cases in which such a test was adopted was *Rutgers v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972). In that case an existing state university sought to build additional student housing facilities in an area where such a land use was prohibited by the township zoning ordinance. The university brought suit, seeking a declaration that it was not subject to the local zoning ordinance. The New Jersey Supreme Court said:

The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation. (citation omitted).

*Id.* 286 A.2d at 701.

After examining prior New Jersey cases, the court stated further:

The rationale which runs through our cases and which we are convinced should furnish the true test of immunity in the first instance, albeit a somewhat nebulous one, is the legislative intent in this regard with respect to the particular agency or function involved. That intent, rarely specifically expressed, is to be divined from a consideration of many factors, with a value judgment reached on an overall evaluation. All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, *the kind of function or land use involved, the extent of the public interest to be served thereby,* the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interest....

*In some instances one factor will be more influential than another or may*

**3.** Some courts and commentators have interpreted *Manchester* as a retreat from strict adherence to the traditional eminent domain test. *See, e.g.,* Note, Intergovernmental Zoning Immunity: Time For A New Test?, 46 Mo.L.Rev. 460 (1981); *Brown v. Kansas Forestry, Fish & Game Comm'n*, 2 Kan.App.2d 102, 576 P.2d 230, 233 (1978).

**4.** One leading commentator concludes that at least ten states have now adopted the "balancing of interests" approach. For citations of those cases and an excellent analysis of the test, see 4 Rathkopf, *The Law of Zoning and Planning,* § 53.06[1].

*be so significant as to completely overshadow all others.* No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. *And there will undoubtedly be cases,* as there have been in the past, *where the broader public interest is so important that immunity must be granted even though the local interests may be great.* The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically.

With regard to a state university ... there can be little doubt that, as an instrumentality of the state performing an essential governmental function for the benefit of all the people of the state, the Legislature would not intend that its growth and development should be subject to restriction or control by local land use regulation....

It is, however, most important to stress that *such immunity in any situation is not completely unbridled.* Even where it is found to exist, it must not ... be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interest.... And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible. (citations omitted). (emphasis ours).

*Id.* 286 A.2d at 702–703.

However, under this "balancing of interests" approach:

*There may be cases in which a state agency may be so convinced of the overriding public need for a particular land use that it may choose to go for-* *ward without resort to local authorities.* Yet, under normal circumstances one would expect the agency to first approach the appropriate governing body with a view toward seeking a change in the applicable zoning or otherwise obtaining the proper approvals necessary to permit the proposed use. (emphasis ours).

*City of Temple Terrace v. Hillsborough Ass'n For Retarded Citizens, Inc.,* 322 So.2d 571, 578 (Fla.App.1975).

■ Two factors override all others in this case. First, like the state university in *Rutgers,* which benefits "all the people of the state", Lambert-St. Louis International Airport benefits not only citizens in the City of St. Louis, but also those in Bridgeton, the entire metropolitan region, and the rest of Missouri. The airport's regional and state wide importance is indicated by overwhelming citizen support in referenda voting, by the Missouri-St. Louis Metropolitan Airport Authority Law, §§ 305.500–305.585, RSMo.1978, and by previous judicial pronouncements. In *McDonnell Aircraft Corp. v. City of Berkeley,* 367 S.W.2d 498, 512 (Mo.1963), the Supreme Court noted that "interference with the control of St. Louis of this great enterprise of highest public utility and purpose cannot be justified on the facts shown." Nor can it be in this case. The record demonstrates that parking facilities are essential to an airport. As justification for its zoning, Bridgeton asserts only a nebulous and unsubstantiated danger to air navigation, an inconsequential increase in traffic congestion, and an undetermined burden on its police department from the construction of the proposed lot.[5] The substantial benefits confered by the operation of the airport on the public clearly outweigh the interests alleged by Bridgeton.

The second crucial factor is that the issue presented here is not the establishment of Lambert-St. Louis International Airport, but its expansion and survival. The loca-

---

**5.** We note that the FAA has safety restrictions applicable to airports which serve to protect aircraft from navigational or airspace hazards.

We also note that the record indicates that the airport will patrol the lot with its own security force.

tion of the airport has already been determined, unlike that of the sewage treatment plant in *Manchester, supra.* Bridgeton argues that the alternative parking lot sites considered and rejected by the airport director were viable options. However, if we were to accept Bridgeton's argument that actions taken by the airport director should be subject to veto by any of the surrounding municipalities, we would place the airport in the same situation as the school district in the hypothetical posed in *Ferriss, supra:*

> Obviously, if the nine cities within the school district had the power to restrict the location of schools, it would become a practical impossibility for the school district to establish school wards and locate schools therein.

304 S.W.2d at 901. Similarly, if the seven municipalities surrounding the airport had the right to restrict the location of essential airport accessory uses, such as parking facilities, it would become a practical impossibility for the airport to grow and expand.

Thus, when necessary airport accessory uses are involved, the "overriding public need" requires that the City of St. Louis be allowed to "choose to go forward without resort to local authorities." *City of Temple Terrace,* 322 So.2d at 578. Of course, St. Louis may not act in an arbitrary manner in connection with the airport, and resort to the courts is not completely foreclosed to those opposing specific proposals regarding airport land use. However, most cases should lend themselves to resolution by summary judgment, as did the suit in *Rutgers, supra.*

Because of our determination that St. Louis is immune from the Bridgeton Zoning Ordinance under these circumstances, we need not resolve the question of the ordinance's constitutionality as applied to the property in question.

Judgment affirmed.

DOWD, P.J., and CRIST, J., concur.